ALLIED SANITATION, INC., Star Recycling, Inc., Resource N.E., Inc., Resource N.E. of Long Island, Inc., Anthony Lomangino, Frances Gusmano, Leo Lomangino, Michael Vecchio, Joseph Vecchio, William Kaiser, Petitioners,

v.

WASTE MANAGEMENT HOLDINGS, INC., Respondent.

No. 00–MISC–021.

United States District Court, E.D. New York.

May 23, 2000.

Anthony M. Radice, Morrison & Foerster LLP, New York City, for petitioners.

William P. Frank, Skadden, Arps, Slate, Meagher & Flom LLP, New York City, for respondent.

## MEMORANDUM AND ORDER

BLOCK, District Judge.

Invoking diversity jurisdiction, petitioners (collectively "the Resource Group"), who are members of a class of plaintiffs suing respondent Waste Management Holdings, Inc. ("Waste Management") for misrepresenting its financial statements in the course of acquiring the class members' assets in exchange for Waste Management common stock, bring this proceeding pursuant to § 4 of the Federal Arbitration Act ("FAA"), 9 U.S.C. § 1 *et seq.*,[1] to stay "any

---

1. "The Arbitration Act is something of an anomaly in the field of federal-court jurisdiction. It creates a body of federal substantive law establishing and regulating the duty to honor an agreement to arbitrate, yet it does not create any independent federal-question jurisdiction." *Moses H. Cone Mem. Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 25 n. 32, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983). Accordingly, "[b]efore a district court may en-

and all arbitration or other alternative dispute resolution [("ADR")] between the parties." Petition for an Order Staying Arbitration, at 6. The parties' asset-for-stock agreement contains a section providing that they would resolve disputes arising under the agreement through an ADR negotiation procedure and, if that proved unsuccessful, by binding arbitration in New York (the "arbitration clause").[2] The Resource Group contends that Waste Management waived its right to invoke the arbitration clause by opposing class certification, as well as substantively participating in the underlying merits of the class action dispute; or, alternatively, that the arbitration clause was fraudulently induced.

The conduct that a party may engage in while opposing class certification without risking waiver of arbitration or other ADR contractual rights has not previously been the subject of judicial inquiry. Under the facts of this case, the Court concludes that there has been no waiver. The Court also rejects the fraudulent inducement claim.

### BACKGROUND

On July 31, 1998, Robert Mowbray ("Mowbray") filed a class action complaint pursuant to Fed.R.Civ.P. ("Rule") 23(b)(3) against Waste Management in the United States District Court for the District of Massachusetts on behalf of all those, like himself, who had sold their assets to Waste Management prior to March 29, 1995 in exchange for Waste Management common stock. This litigation was triggered by a press release issued by Waste Management on February 24, 1998, admitting that due to improper accounting methods Waste Management's financial statements had overstated income by hundreds of millions of dollars during the prior eight years. Since Waste Management, in its asset acquisition contract with Mowbray, had expressly warranted the truth and accuracy of its financial statements, Mowbray sued for breach of this warranty.

In October 1998, about three months after Mowbray initiated his lawsuit, Waste Management produced over 100 asset-for-stock acquisition contracts dating from January 1, 1990 to February 24, 1998, in response to Mowbray's discovery request. Included in this submission was an agreement between Waste Management and the Resource Group, dated March 1, 1996. The agreement provided for the acquisition by Waste Management of substantially all of the Resource Group's assets in exchange for approximately $220,000,000 of Waste Management common stock. It contained similar express warranties by Waste Management in regard to its financial statements that were contained in Waste Management's contract with Mowbray. Also, as in Mowbray's contract, it contained a choice-of-law provision calling for the agreement to be governed by and

---

tertain a petition under the FAA, there must be an 'independent basis of jurisdiction,'" *Westmoreland Capital Corp. v. Findlay*, 100 F.3d 263, 267 (2d Cir.1996) (internal citation omitted), such as, in this case, diversity. Otherwise, "[a] petition under FAA § 4 to compel or stay arbitration must be brought in state court." *Id.* at 268.

**2.** The arbitration provision of the dispute resolution section states:

(1) Subject to [mandatory ADR procedure] of this section [ ], the parties agree to participate in good faith in the ADR to its conclusion. If the disputing parties are not successful in resolving the dispute through ADR, then such dispute shall be submitted to binding arbitration. Any such arbitration shall be conducted by a committee of three arbitrators (one appointed by the Representative, one appointed by WMX and one appointed by the other two so appointed), which shall be appointed within 30 days after termination of the ADR procedure. The arbitrators shall meet in New York, New York, shall abide by the rules of the American Arbitration Association and their decision shall be made within 45 days and shall be final and binding on all parties. Agreement between Waste Management and the Resource Group, attached as Ex. 1 to Affidavit of Jamie A. Levitt, filed in support of the Resource Group's petition, dated February 3, 2000 ("Levitt Aff."), at 64 (§ 4.8).

construed in accordance with Illinois contract law.[3]

On December 23, 1998, Mowbray filed a motion for partial summary judgment as to liability on his breach of warranty claim. On January 19, 1999, Waste Management cross-moved for judgment on the pleadings and, alternatively, argued against the granting of summary judgment. A week later, on January 26, 1999, while the motions were *sub judice*, Mowbray served Waste Management with a motion to certify an expanded class to include all persons or entities involved in asset-for-stock transactions with Waste Management during the period from January 1, 1990 to February 24, 1998. This proposed amended class comprised 324 persons or entities entailing 119 transactions,[4] and captured the 1996 $220,000,000 transaction with the Resource Group. It thereby raised the stakes of Waste Management's potential exposure in the class action litigation because, as Waste Management's counsel has acknowledged, the Resource Group was "[a] very big, major player." Transcript of Oral Argument, February 23, 2000 ("Tr."), at 39.

On April 26, 1999, the district court denied Waste Management's motion for judgment on the pleadings and granted Mowbray's motion for partial summary judgment. *See Mowbray v. Waste Management Holdings, Inc.*, 45 F.Supp.2d 132 (D.Mass.1999) ("*Mowbray I*"). As set forth in the court's decision, Waste Management did not dispute its financial representations contained in its agreement with Mowbray or the facts recited in the press release. Rather, it sought dismissal of the complaint on the ground that Illinois law required reliance in order to sue for breach of express warranty. The court rejected this argument.

Although the court resolved the substantive liability issue, it did not at that time address the issue of class certification. Rather, it allowed the parties to develop the record in order to explore fully whether any class should be certified at all and, if so, the appropriate constituency of the class. *See* Clerk's Notes re: Case Management Conference, Civil Docket for Case No. 98–CV–11534 ("Civil Docket"), (May 4, 1999), attached as Ex. 6 to Levitt Aff., at 9 (Entry 62) (setting hearing date and noting that "[a]t the hearing the Court will allow the parties to argue the existence and extent of any class under Rule 23"). Waste Management vigorously availed itself of such opportunity, submitting extensive papers and engaging in oral argument in opposition to class certification. On October 15, 1999, the court rendered its class certification decision. It certified the following class:

> [a]ll persons or entities which engaged in transactions, during the period January 1, 1990 to February 24, 1998, with Waste Management, whereby (i) Waste Management ... acquired assets of those persons and entities ... for ... common stock of Waste Management, (ii) Waste Management furnished financial statements to those persons and entities pertaining to its results during the period January 1, 1990 to February 24, 1998, and (iii) Waste Management expressly warranted by contract provision the truth and accuracy of such financial statements.

*Mowbray v. Waste Management Holdings, Inc.*, 189 F.R.D. at 202 ("*Mowbray II*").

---

**3.** The choice-of-law provision states: "Governing Law. This Agreement shall be governed by and construed in accordance with the laws of the State of Illinois applicable in the case of contracts made and to be performed in such state." *See* Levitt Aff., Ex. 1, at 90(§ 9).

**4.** Unlike all the other facts herein, which are drawn from the parties' submissions and are not in dispute, these numbers are taken from the district court's decision in *Mowbray v. Waste Management Holdings, Inc.*, 189 F.R.D. 194, 196 (D.Mass.1999). In his Memorandum of Law in Support of Plaintiff's Motion for Class Certification, Mowbray referenced 331 persons or entities and 122 transactions. *See* Levitt Aff., Ex. 11, at 5.

Thus, the Resource Group's status changed at that time from putative class member to certified class member.

In this decision, the court first explained that it had previously decided to address Mowbray's summary judgment motion prior to addressing the issue of class certification because it believed that doing so would help to define the class. Specifically, the court reasoned that:

> if counsel for the named plaintiff can frame a compelling motion, even for partial summary judgment, its allowance will operate with preclusive effect upon the defendant and will produce a substantive record that will inform the Court, as nothing else could, of the proper parameters of the plaintiff class and whether the named plaintiff will fairly and accurately represent that class.

*Id.* at 197. On the merits, in ruling that class membership should be accorded to all those, such as Mowbray and the Resource Group, whose contracts contained express warranties by Waste Management as to the truth and accuracy of its financial statements, the court rejected a host of arguments advanced by Waste Management against the Rule 23(b)(3) commonality and predominance prerequisites. *See id.* at 198–201. Notably, at no time did Waste Management argue that any of the proposed class members, including the Resource Group, should be barred from class membership because a contractually binding arbitration clause was extant.

On October 29, 1999, Waste Management filed a petition in the United States Court of Appeals for the First Circuit seeking leave to file an interlocutory appeal of the class certification order, pursuant to Rule 23(f). However, it did not seek a stay of the class action litigation. Accordingly, on November 24, 1999, Mowbray, representing the newly certified class, quite logically again sought partial summary judgment as to liability for breach of express warranty. Facing a problematic scenario, especially in light of

the district court's rationale for addressing Mowbray's prior summary judgment motion on the merits—that "its allowance will operate with preclusive effect upon the defendant"—Waste Management then took the following actions:

1. On December 7, 1999, it obtained an order from the district court extending its time to respond to the summary judgment motion to December 29, 1999, and at a status conference on that date, asserted for the first time that the Resource Group should not be included in the class because of the arbitration clause.

2. On December 10, 1999, it served the Resource Group with a Notice of Demand for Alternative Dispute Resolution ("Demand"), which provided, in relevant part:

> Waste Management, Inc., ... hereby demands that all parties to the Agreement ... opt out of the pending class action entitled *Mowbray v. Waste Management Holdings, Inc.,* Case No. 98–11534–WGY (D.Mass.) and submit to alternative dispute resolution ("ADR").

\* \* \* \* \* \*

> The parties have agreed that they will participate in the ADR procedure to its conclusion and will not terminate negotiations concerning resolution of the dispute until at least ten (10) days thereafter. Each party has agreed not to commence an arbitration proceeding or seek other remedies prior to the conclusion of the ten (10) day post-ADR negotiation period. If the disputing parties are not successful in resolving the dispute through ADR, then the dispute shall be submitted to binding arbitration.

3. On December 17, 1999, it instituted a motion before the district court seeking modification of the court's class certification order to exclude as members of the class all parties, such as the Resource Group, who had contractually agreed to arbitration.[5] It made this motion just af-

---

5. Although the motion was framed to exclude

from the class all persons or entities who had

ter the circuit court, on December 13, 1999, had noted in an order setting a briefing schedule and directing the parties to address, in addition to the merits, the standards under Rule 23 for granting leave to appeal, that no request for a stay had been made, and instructed that "the district court proceedings may continue in the normal course pending disposition of the instant petition and/or appeal." Civil Docket, attached as Ex. 6 to Levitt Aff., at 12 (Entry 91).

4. On December 21, 1999, it brought on a motion in the district court for a stay of all further proceedings in that court pending the circuit court's decision. The motion was denied on December 27, 1999.

Although it arguably could have initiated a judicial proceeding against the Resource Group under the FAA to compel compliance with the parties' arbitration clause, and sought therein a stay of the Resource Group's participation in the class action litigation, Waste Management chose instead to oppose Mowbray's summary judgment motion on behalf of the certified class, and submitted its opposition papers on December 29, 1999, in accordance with the prescribed schedule. This marked Waste Management's only substantive submission in respect to the merits of the lawsuit since the Resource Group had become a putative class member eleven months earlier. However, on December 17, 1999, in addition to moving to modify the class on that date, Waste Management had served Mowbray with a set of interrogatories and requests for production of documents directed to members of the certified class.

On December 30, 1999, presumably in response to Waste Management's December 10, 1999 Demand, Mowbray filed a motion on behalf of the Resource Group to stay arbitration. On January 10, 2000, the Resource Group appeared in the class action through its own counsel and filed an opposition to Waste Management's motion to modify the class, arguing, as it now does, that by its conduct Waste Management had waived its right to arbitrate or, alternatively, that the arbitration clause had been fraudulently procured. *See* Civil Docket, attached as Ex. 6 to Levitt Aff., at 13 (Entry 103) ("Notice of Appearance of Attorney for Class Members referred to collectively as Resource"); Opposition to Defendant's Motion for Modification of Order Certifying Class, attached as Ex. 19 to Levitt Aff.

On January 18, 2000, the district court heard oral argument on the summary judgment motion and reserved decision. The motion has yet to be decided. On that date, the court also addressed the motion to stay arbitration and the related motion to modify the class, ruling that since the arbitration clause provided that arbitration shall be conducted in New York, that state, rather than Massachusetts, was the proper venue for resolving all issues concerning the enforcement of the arbitration clause. This proceeding was thereafter initiated by Order to Show Cause dated February 3, 2000.

By motion dated February 15, 2000, Waste Management moved to dismiss the petition on the grounds that (i) the petition is not ripe since the contract obligates the parties to exhaust negotiations through the ADR process before proceeding to arbitration; (ii) the Court lacks the authority to stay arbitration; (iii) Waste Management has acted consistent with its right to arbitrate and has not waived such right; and (iv) the arbitration provision was not

agreed to arbitrate their disputes with Waste Management, in reality it only pertained to the Resource Group, since the district court was advised by Waste Management in its memorandum in support of the motion that "[t]he modification sought will only impact one of the thirty-two transactions (and 81 individuals) currently encompassed by the Court's certification order," and Waste Management attached portions of its agreement with the Resource Group to its memorandum. *See* Memorandum in Support of Defendant's Motion for Modification of Order Certifying Class, attached as Ex. 4 to Levitt Aff., at 6.

fraudulently induced.[6]

In respect to the issue of fraudulent inducement, the Resource Group factually relies upon affidavits from two of its representatives who were involved in the negotiation of the parties' agreement, including the arbitration clause. In one of the affidavits, Anthony Lomangino ("Lomangino"), who was then the President and Chief Executive Officer of the Resource Group, tells of a meeting in February 1996 with Waste Management's President, Bill Hulligan ("Hulligan"), the purpose of which "was to discuss and hopefully resolve the final list of disputed issues." Affidavit of Anthony Lomangino, undated ("Lomangino Aff."), attached as Ex. 20 to Levitt Aff., ¶ 5. According to Lomangino, he told Hulligan at that time that the Resource Group "did not want to give up any of our legal remedies against Waste Management." *Id.* In response, Hulligan allegedly represented to Lomangino that Waste Management "was 'rock solid,' with a long and consistent record of reported earnings," that "one of the largest accounting firms in the world, Arthur Andersen, had been signing off on Waste Management's financial statements for years," that Lomangino "had 'nothing to worry about,' that there would be 'nothing for us to litigate over,' and that [Lomangino] should not ruin a $200 million deal over a standard clause like arbitration." *Id.* Consequently, Lomangino claims that he "gave up [his] objection to arbitration" because if Hulligan "had not made these statements, which turned out to be false, I would not have agreed to include the arbitration clause in our agreement." *Id.* ¶ 6.

In the other affidavit, William Kaiser ("Kaiser"), who as the Resource Group's Chief Financial Officer was also at this meeting, recounts that during the meeting "Lomangino and I advised Bill Hulligan that Resource did not wish to include a mandatory arbitration provision in the agreement." Affidavit of William Kaiser, dated January 5, 2000, attached as Ex. 5 to Levitt Aff., ¶ 9. However, Hulligan "argued that arbitration was standard procedure, and that in any event Waste Management always included arbitration clauses in their agreements." *Id.* As Kaiser states in his affidavit:

> After discussing the subject at length, I recall Bill Hulligan finally putting his arm around Anthony Lomangino and stating words to the effect of—"Hey look, the arbitration agreement won't cost you anything. The only possible dispute you could have with us is that the strip (*i.e.,* stock) would not be valued properly and that's ridiculous because we're a public company with years and years of audited financial statements on file with the SEC."

*Id.* Kaiser also asserted: "Once again, Bill Hulligan stressed the low volatility of Waste Management's stock relative to the industry. He also stressed the fact that a major accounting firm, Arthur Anders[e]n, audited Waste Management's books." *Id.* Consequently, Kaiser maintains that "[w]ith supposedly nothing to lose, Anthony Lomangino and I relied upon Bill Hulligan's statements and agreed to the arbitration provision." *Id.* ¶ 10.

On March 31, 2000, the circuit court affirmed the district court's class certification order. It noted, however, that although it was not passing upon "the appropriateness of delaying a class certification ruling until after acting upon an individual plaintiff's summary judgment motion," since Waste Management did not "directly challenge the unorthodox timing of the district court's entry of partial summary judgment," such "sequencing raises serious questions." *Waste Management Holdings, Inc. v. Mowbray,* 208 F.3d 288,

---

**6.** Waste Management's motion also challenged the propriety of placing venue in the Eastern District of New York instead of the Southern District of New York, since the arbitration clause called for arbitration in "New York, New York." Levitt Aff., Ex. 1, at 64 (§ 4.8(1)). However, it withdrew this aspect of its motion during oral argument. *See* Tr. at 17–18.

299 n. 7 (1st Cir.2000). Accordingly, it urged district courts "to exercise caution before deciding to embrace it." *Id.*

## DISCUSSION

### I. Ripeness

 Waste Management argues that because arbitration cannot be invoked until the ADR negotiation process is exhausted, the petition is not ripe for review. Article III of the Constitution requires that the parties have "a dispute definite and concrete, not hypothetical or abstract." *Motor Vehicle Mfrs. Ass'n v. New York State Dep't of Envtl. Conservation,* 79 F.3d 1298, 1305 (2d Cir.1996) (quoting *Babbitt v. United Farm Workers Nat'l Union,* 442 U.S. 289, 298, 99 S.Ct. 2301, 60 L.Ed.2d 895 (1979)). Consequently, ripeness is a constitutional prerequisite to a court's exercise of subject matter jurisdiction: *See Abbott Lab. v. Gardner,* 387 U.S. 136, 149–50, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967), *abrogated on other grounds, Califano v. Sanders,* 430 U.S. 99, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977); *Air Espana v. Brien,* 165 F.3d 148, 151 (2d Cir.1999); *Nutritional Health Alliance v. Shalala,* 144 F.3d 220, 225 (2d Cir.1998). The application of the ripeness doctrine turns on (1) the fitness of the issues for adjudication, and (2) the hardship to the parties that would result from withholding review. *See Abbott Lab.,* 387 U.S. at 149, 87 S.Ct. 1507; *Motor Vehicle Mfrs. Ass'n v. New York State Dep't of Envtl. Conservation,* 79 F.3d 1298, 1305 (2d Cir.1996). "The law of ripeness is now very much a matter of common sense." *Seafarers Int'l Union of N. Am. v. United States Coast Guard,* 736 F.2d 19, 26 (2d Cir.1984) (citing *Continental Air Lines, Inc. v. Civil Aeronautics Bd.,* 522 F.2d 107, 124 (D.C.Cir.1974)).

 Common sense dictates that the conditional nature of the arbitration clause does not preclude litigation challenging the clause's enforceability. The concept of arbitration plausibly embraces all contractual dispute resolution mechanisms, consistent with Congress's design to foster alternative means to resolving litigation. *See, e.g., CB Richard Ellis, Inc. v. American Env'tal Waste Mgmt.,* 98–CV–4183, 1998 WL 903495, at *2 (E.D.N.Y. Dec. 4, 1998) (finding mediation to fall within FAA's definition of arbitration); *AMF Inc. v. Brunswick Corp.,* 621 F.Supp. 456, 460 (E.D.N.Y. 1985) (applying the FAA to require a manufacturer to comply with its agreement with a competitor to obtain a nonbinding advisory opinion). Plainly, the petition is ripe for review.

### II. Waiver

Oral argument sharpened the focus of the parties' contentions regarding the waiver issue. Principally, the Resource Group claims that waiver was effected because Waste Management failed to raise the arbitration clause until it lost the certification battle in the district court and, furthermore, because it thereafter opposed the second summary judgment motion on the merits. Given the district court's class certification decision and that Waste Management was consequently facing the dire prospect of losing the new summary judgment action in light of the precedential nature of the district court's prior summary judgment decision, counsel for the Resource Group argues that "this is a classic case of substantive prejudice—where Waste Management has lost two important decisions and now wants to change the venue." Tr. at 31.

For its part, Waste Management contends that substantive prejudice is wanting because it was free to oppose the initial summary judgment motion without risk of waiver since the Resource Group was not a putative class member at that time, and its opposition to class certification did not implicate the merits of the parties' dispute. Although acknowledging that it could have invoked the arbitration clause during the course of the class certification litigation, counsel for Waste Management argues that since the Resource Group was a major shareholder, rather than engaging it in

potentially divisive substantive litigation, it was "hoping to try to resolve this," Tr. at 38, by "trying to negotiate a settlement." Tr. at 37. Moreover, notwithstanding the Resource Group's status as a putative class member, "[i]t just didn't make sense" to say "[w]e have a fight with you, we want to go to arbitration," Tr. at 40, since "[y]ou don't pick a fight with a major stockholder . . . unless he wants to pick the fight." *Id.* Consequently, in the absence of substantive prejudice, Waste Management contends that waiver is not warranted: "There has been very little discovery other than turning over all the contracts. . . . There's been no depositions, there's been no interrogatory answers or anything like that. There's been no prejudice the way the Second Circuit works it—real prejudice." Tr. at 33–34.

■ The Second Circuit has "often and emphatically applied the strong federal policy favoring arbitration" embodied in the FAA. *Leadertex, Inc. v. Morganton Dyeing & Finishing Corp.,* 67 F.3d 20, 25 (2d Cir.1995) (citations omitted). Waiver of the right to arbitrate "is not to be lightly inferred." *Rush v. Oppenheimer & Co.,* 779 F.2d 885, 887 (2d Cir.1985) (quoting *Carcich v. Rederi A/B Nordie,* 389 F.2d 692, 696 (2d Cir.1968)). Consequently, any doubts regarding the issue of waiver should be resolved in favor of arbitration. *See PPG Indus., Inc. v. Webster Auto Parts Inc.,* 128 F.3d 103, 107 (2d Cir.1997); *see also Leadertex,* 67 F.3d at 25 (citing *Moses H. Cone Mem. Hosp.,* 460 U.S. at 24–25, 103 S.Ct. 927).

■ Although "the issue is fact-specific and there are no bright-line rules," *S & R Co. of Kingston v. Latona Trucking, Inc.,* 159 F.3d 80, 83 (2d Cir.1998) (citing *Lead-*

*ertex,* 67 F.3d at 25), "waiver of the right to compel arbitration due to participation in litigation may be found only when prejudice to the other party is demonstrated." *Rush,* 779 F.2d at 887. Thus, "[m]ere delay in seeking arbitration, absent prejudice to the opposing party, does not constitute waiver." *Com-Tech Assocs. v. Computer Assocs. Int'l,* 938 F.2d 1574, 1576 (2d Cir.1991). "Sufficient prejudice to infer waiver has been found when a party seeking to compel arbitration engages in discovery procedures not available in arbitration, makes motions going to the merits of an adversary's claims, or delays invoking arbitration rights while the adversary incurs unnecessary delay or expense." *Cotton v. Slone,* 4 F.3d 176, 179 (1993) (internal citations omitted). The Second Circuit has also recognized that "[p]rejudice can be substantive, such as when a party loses a motion on the merits and then attempts, in effect, to relitigate the issue by invoking arbitration." *Kramer v. Hammond,* 943 F.2d 176, 178 (2d Cir. 1991). This type of prejudice, therefore, precludes a party "sensing an adverse court decision" from having "a second chance in another forum." *Rush,* 779 F.2d at 890 (quotation omitted).[7]

■ Upon analysis, Waste Management's conduct in opposing Mowbray's initial summary judgment motion, opposing class certification, waiting for just about two months after the district court certified the class before invoking the arbitration clause, and thereafter opposing the second summary judgment motion, does not rise to the level of waiver.

At oral argument, counsel for the Resource Group candidly acknowledged in response to the Court's inquiry as to wheth-

---

7. Since "prejudice" is the *sine qua non* for waiver, it is somewhat puzzling that the Second Circuit in *Leadertex* viewed it as simply one of a number of factors to be considered in assessing waiver, together with the "amount of litigation (usually the exchange of pleadings and discovery)," the "time elapsed from the commencement of litigation to the request for arbitration," and the "proximity of a trial date when arbitration is sought." 67 F.3d at 25. This formulation was subsequently repeated *verbatim* in *Latona Trucking, Inc.,* 159 F.3d at 84. However, neither of these cases found waiver in the absence of prejudice, and the *Leadertex* enumerated factors should be understood to be factors affecting the singular issue of prejudice.

er there is "some point in time that would trigger some realistic point of departure to measure the issue of waiver," that such time was when the Resource Group became a putative class member in January 1999. Tr. at 42. This concession is entirely reasonable since Waste Management cannot be held accountable for opposing Mowbray's initial summary judgment motion when the Resource Group was neither an actual nor putative litigant. *See Perry v. ICN Pharmaceuticals,* 866 F.Supp. 120, 121 (S.D.N.Y.1994) ("Pendency of a suit by plaintiff against ICN and others concerning overlapping subject matter cannot deprive the moving defendants of the benefit of their arbitration agreement with plaintiff; otherwise arbitration could be defeated at any time when related litigation with nonsignatories of the arbitration agreement was initiated. This would destroy the usefulness of arbitration in many complex commercial contexts, contrary to the objectives of the United States Arbitration Act.").

As for Waste Management's opposition to class certification, it is not known at what point in time the Resource Group became aware of Mowbray's litigation and, in particular, its inclusion as a member of the new putative class. As a major stockholder, the Resource Group presumably had knowledge that it was a putative class member during the course of Waste Management's opposition to class certification.[8] However, it did not seek lead plaintiff status or otherwise actively assert itself in the litigation. Indeed, the record reflects that the Resource Group never appeared in the class action through its own counsel until after arbitration was demanded.[9] Waste

Management had fair reason to believe, therefore, that the Resource Group did not want to be an active player in the class certification battle, that the Resource Group might not wish to attach itself to Mowbray's litigation, and that settlement was a viable option.

In any event, opposition to class certification does not implicate the merits of the underlying dispute. *See Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 177, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974) ("We find nothing in either the language or history of Rule 23 that gives a court any authority to conduct a preliminary inquiry into the merits of a suit in order to determine whether it may be maintained as a class action."); *Caridad v. Metro–North Commuter RR,* 191 F.3d 283, 291 (2d Cir.1999) ("a motion for class certification is not an occasion for examination of the merits of the case"); *Schweizer v. Trans Union Corp.,* 136 F.3d 233, 239 (2d Cir.1998) ("*Eisen* makes clear that the determination of whether a class meets the requirements of Rule 23 must be performed separately from the determination of the merits"). As explained in *Eisen,* this reading of Rule 23 is buttressed by the rationale that reaching the merits "may result in substantial prejudice to a defendant, since of necessity it is not accompanied by the traditional rules and procedures applicable to civil trials," and "may color the subsequent proceedings and place an unfair burden on the defendant." *Eisen,* 417 U.S. at 178, 94 S.Ct. 2140. Since the merits are not implicated, it is difficult to fathom how a putative class member can be prejudiced by a defendant's efforts to resist certifica-

---

8. The Resource Group does not take issue with Waste Management's representation that counsel for the parties had been in contact with each other "long before a class certification motion was ever filed in this action—and [the Resource Group's counsel was] familiar with the status of this litigation." Memorandum in Support of Defendant's Motion for Modification of Order Certifying Class, attached as Ex. 4 to Levitt Aff., at 6.

9. Nor did the district court on its own initiative deem it necessary to actively engage the Resource Group in the class certification litigation. *See* Fed.R.Civ.Pro. 23(d)(2); *In re Joint Eastern & Southern Districts Asbestos Litig.,* 132 F.R.D. 332, 333 (S.D.N.Y.1990) (court may proactively evaluate counsel needs of putative class); *In re Ivan F. Boesky Secs. Litig.,* 120 F.R.D. 624, 625–26 (S.D.N.Y.1988) (court may solicit intervention of representative plaintiff).

tion in order to require a party with a potential claim to decide whether to engage in separate litigation.

Moreover, because of the broad reach of the supervisory powers granted to the courts under Rule 23(d), and the very nature of the concept of putative class membership, class action litigation affords a vehicle for avoiding a judicial resolution of the merits. Thus, "it is appropriate for the parties to a class action to negotiate a proposed settlement of the action prior to certification of the class" and, indeed, "the court may request the parties to engage in settlement negotiations before certification." *In re Joint Eastern & Southern Districts Asbestos Litig.*, 132 F.R.D. at 333 (citations omitted). Significantly, because a potential class member "may leave the putative class at will," the courts have "permitted potential members of a class not yet certified to settle their individual claims with the potential defendant." *In re Painewebber Ltd. Partnerships Litig.*, 147 F.3d 132, 138 (2d Cir.1998). Thus, Waste Management's articulated desire to reach a negotiated resolution with the Resource Group during the course of the class certification litigation in order to avoid litigation on the merits is conceptually sound.

Furthermore, Waste Management's decision to refrain from raising the arbitration clause as a defense to the certification of the Resource Group as a class member was also consistent with the notion of settlement. There simply was no rational reason for Waste Management to throw the arbitration gauntlet down, thereby jeopardizing settlement prospects, until the Resource Group chose the path it wished to travel. In that regard, the class certification format afforded the Resource Group many paths. In addition to deciding whether it wished to be an active or passive putative class member or to withdraw entirely from the putative class, it could await the class certification decision and choose to opt out if included in the class, without any prejudice to its right to

thereafter initiate separate litigation. *See, e.g., Crown, Cork & Seal Co., Inc. v. Parker*, 462 U.S. 345, 352, 103 S.Ct. 2392, 76 L.Ed.2d 628 (1983) (tolling statute of limitations during pendency of class certification litigation). And since it did not initiate the underlying class action litigation, it could also decide after certification whether to invoke arbitration, without apparent risk of waiver.

In sum, Waste Management's efforts to thwart class certification and, consequently, to require the Resource Group to chart its own litigation course, if indeed, it wished to litigate at all, was not inconsistent with Waste Management's arbitration rights.

Case precedent supports this conclusion. Thus, in *Rush*, where the plaintiff brought an action alleging federal securities, RICO, and a pendent common law claim, the court held that the defendants had not waived their right to seek an order compelling arbitration. After many months of pretrial proceedings, the defendants moved to sever and to compel arbitration of the common law claim after the district court had, upon reargument, denied the defendants' motion to dismiss the punitive damage aspect of that claim. In respect to the extensive pretrial proceedings, the court noted that they only involved the securities and RICO claims, which were nonarbitrable. In respect to the arbitrable common law claim, the court held that, although the defendants had first sought dismissal of the punitive component of the common law claim before resorting to arbitration, the plaintiff could not be deemed to have been prejudiced because punitive damages would not have been available in arbitration.

In *Sweater Bee By Banff, Ltd. v. Manhattan Indus., Inc.*, 754 F.2d 457 (2d Cir. 1985), relied on by the court in *Rush*, the court contrasted a Rule 12(b)(6) motion, calling for the dismissal "of a totally needless and unmeritorious claim," with a Rule 56 motion on the merits, "at which point the effect would be to preclude any arbi-

tration of the issue by virtue of waiver," *id.* at 465, and gave its approbation to motions seeking to dispose of matters outside the scope of the parties' arbitration agreement. *See id.* at 463 ("where, as here, a plaintiff files an intricate complaint, setting forth numerous claims outside the scope of, though partially related to, the arbitrable claims, he should not be altogether surprised that a defendant takes the protective step of filing a motion to dismiss"). Class certification litigation, involving the adjudication of nonarbitrable issues which do not go to the substantive merits, falls within *Rush* and *Sweater Bee*'s conceptual grasp.[10]

The question remains, therefore, whether the congruence of the circumstances leading to Waste Management's seemingly precarious perch should preclude invocation of the arbitration clause. If, as *Rush* instructs, a court is faced with a case where the party attempting to invoke arbitration was truly responsible for seeking the proverbial second bite of the apple, it should bar the bite. As in *Rush*, this does not appear to be such a case.

The present predicament confronting Waste Management is more circumstantial than contrived. Regardless of the timing of Waste Management's Demand, it could not have affected Mowbray's initial summary judgment motion, which was interposed before the Resource Group came into play. Nor could it have thwarted Mowbray's second summary judgment motion, which surely would have been made even if the Resource Group was never certified as a class member. As for Waste Management's opposition to class certification, it was initiated even before the Resource Group's advent, and therefore undoubtedly would have perdured whether or not the Resource Group had become a putative class member. Notably, the singular pretrial discovery activity that Waste Management initiated—its service on December 17, 1999 upon Mowbray of interrogatories and document requests—was directed to all the class members, not simply to the Resource Group. In any event, it transpired only after Waste Management had served its Demand and had moved to exclude the Resource Group from the newly certified class, and there is no claim by the Resource Group that it incurred any costs or expenses in that regard.

In sum, even if the Resource Group never existed, Mowbray's summary judgment motions would undoubtedly have materialized. Adding to the circumstantial mix was the fact that the district court chose to address the merits of the initial summary judgment motion before addressing class certification, a procedure later seriously called into question by the circuit court.[11] Moreover, once again, Waste Management cannot be faulted for failing to invoke the arbitration clause prior to class certification since its opposition to

**10.** In deference to the principle that arbitration waiver cases do not lend themselves to "bright-line rules," *S & R Co. of Kingston,* 159 F.3d at 83, the Court does not suggest that opposition to class certification could never trigger waiver concerns, such as, perhaps, if the Resource Group, rather than Mowbray, had initiated the class action litigation or sought lead representative status, thereby clearly signaling to Waste Management its intention to litigate, rather than to arbitrate.

**11.** In support of the circuit court's concern about the sequencing of the district court's decisions, it cites, *inter alia,* to Newberg's treatise on class actions, which advances as a rationale for not deferring class certification until after decision on the merits, the need "to identify the stakes of the case so that the parties may choose their litigation strategies accordingly." 2 Herbert B. Newberg & Alba Conte, Newberg on Class Actions § 7.15, at 7–52 (3d ed.1992). This rationale is in keeping with Waste Management's decision to refrain from invoking arbitration prior to certification. The Second Circuit has recently noted, however, that "[t]here is nothing in Rule 23 which precludes the court from examining the merits of the·plaintiff's claims on a proper Rule 12 motion to dismiss or Rule 56 motion for summary judgment simply because such a motion precedes resolution of the issue of class certification." *Schweizer v. Trans Union Corp.,* 136 F.3d 233, 238 (2d Cir.1998) (internal quotation omitted).

certification was essentially consistent with its expressed purpose to avoid, rather than engage in, litigation on the merits.

If Waste Management is to be faulted at all, it can only be because it waited just about two months after the district court rendered its class certification decision before serving its Demand, and thereafter responded to the second summary judgment motion in lieu of initiating a proceeding under the FAA to compel compliance with the arbitration clause and seek therein a stay of the litigation. In respect to the belated Demand, counsel for Waste Management admirably acknowledged at oral argument that it could have been more timely made. Nonetheless, the close to two-month interregnum was totally benign and cannot realistically form part of the prejudice mix. As for its decision not to resort to injunctive relief under the FAA, it may well be that Waste Management believed that it had to satisfy the conditional alternative dispute negotiation aspect of the arbitration clause before judicially seeking to compel arbitration—a not totally untenable position under a strict interpretation of the FAA. In any event, it only responded to the summary judgment motion after it interposed its Demand and unsuccessfully sought to stay the class certification litigation. Moreover, all of its actions thereafter were thoroughly consistent with its efforts to arbitrate rather than to litigate.

The circumstantial aspects of this case and Waste Management's essentially defensive posture in seeking to avoid litigation with a major stockholder who neither initiated the class action litigation nor asserted itself as a major player in the litigation contrast sharply with the principal cases advanced by the Resource Group, *Kramer v. Hammond*, 943 F.2d 176 (2d Cir.1991), and *Menorah Ins. Co., Ltd. v. INX Reinsurance Corp.*, 72 F.3d 218 (1st Cir.1995), which, upon analysis, undermine its contentions.

In *Kramer*, although the court recognized the concept of substantive prejudice, it predicated its decision on the "second type of prejudice," to be "determined contextually, by examining the extent of the delay, the degree of litigation that has preceded the invocation of arbitration, the resulting burdens and expenses, and the other surrounding circumstances." 943 F.2d at 179. In that context, the court concluded that the defendant waived his right to arbitration by engaging in proactive litigation over a protracted period of time, including extensive pretrial litigation "apparently designed to wear down his opponent." *Id.* This litigation entailed both unsuccessful challenges to personal jurisdiction in the courts of South Carolina, culminating in an unsuccessful *certiorari* application to the United State Supreme Court, as well as unsuccessful efforts by the defendant to adjudicate the merits of the case in protective companion litigation brought by the plaintiff in New York, by filing a motion for summary judgment and insisting that its resolution not be stayed while the South Carolina jurisdictional issue was *sub judice.* Consequently, the court reasoned:

> Though the resistance to the assertion of personal jurisdiction in South Carolina might not alone have established waiver of arbitration, the extensive litigation in New York, where jurisdiction was not in doubt, substantially augmented the total delay and expense and focused on the merits of the dispute, thereby establishing waiver.

*Kramer*, 943 F.2d at 179.

Thus, the court concluded that defendant's "maneuvers had the inevitable effect of causing [plaintiff] to expend substantial time and money," and that defendant's retreat to his contractual right to arbitration only after he "had exhausted his pretrial maneuvers" "suggest[ed] a disingenuousness that the presumption in favor of arbitration was not intended to protect." *Id.* at 180. Notably, the court contrasted this scenario with *Rush* and *Sweater Bee*, where "the number of nonarbitrable issues

more than justified the litigation that preceded the demand for arbitration," and "there were sound, nonprejudicial reasons to justify the delays and the additional expenses incurred when the parties did not immediately invoke arbitration." *Id.*

It should at once be apparent how different the present case is from *Kramer*, which railed against proactive, rather than reactive, litigation, and how opposition to class certification is more in keeping with the rationale of *Rush* and *Sweater Bee* in seeking to address concerns which do not go to the merits of arbitrable issues.

Petitioner's reliance on the First Circuit's decision in *Menorah* is also misplaced. There, the court found both an explicit waiver, since the party seeking arbitration had declined a prior invitation to arbitrate, and an implicit waiver, since the plaintiff "had incurred expenses as a direct result of [defendant's] dilatory behavior" in seeking arbitration only after it allowed a default judgment to be entered against it and proceedings had been initiated to execute the judgment. *Menorah*, 72 F.3d at 222. The court's unwillingness to afford the defendant an arbitration forum to obviate the consequences of a judgment resulting from its recalcitrant behavior stands in sharp contrast to Waste Management's understandable efforts to avoid class action litigation.

During oral argument, while conceding that there is no case precedent addressing waiver in the context of class certification litigation, counsel for the Resource Group drew upon the Second Circuit's decision in *Zwitserse* as analytically relevant since waiver was found there by reason of conduct predating the formal initiation of litigation. However, the fateful conduct entailed an extensive preliminary witness hearing in Amsterdam under Netherlands law for the purpose of preserving the testimony of witnesses "whose attendance at arbitration hearings in New York could not be compelled." *Zwitserse*, 996 F.2d at 1480. The court viewed this tactic as "precisely the type of prejudice our cases have

sought to avoid," namely, allowing a party "to unfairly profit from the benefits of discovery that it most likely would not otherwise have been entitled to in arbitration." *Id.* Waste Management's opposition to class certification plainly was not designed to disadvantage the Resource Group in arbitration.

### III. Fraudulent Inducement

 Under the holding of *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 87 S.Ct. 1801, 18 L.Ed.2d 1270 (1967), the issue of fraudulent inducement of an arbitration clause must be resolved by the court, not the arbitrator. The Resource Group contends that it is entitled to a jury trial on this issue on the strength of Lomangino's and Kaiser's affidavits. Relying on the Second Circuit's decision in *Campaniello Imports, Ltd. v. Saporiti Italia S.p.A.*, 117 F.3d 655 (2d Cir.1997), Waste Management argues that these affidavits do not warrant a trial because it is undisputed "that the arbitration provision was negotiated at arm's length," that "there is no allegation that the terms of the arbitration agreement were not disclosed to Petitioners or that there were any false statements about the nature of the arbitration clause," and that "[u]nder these circumstances, Petitioners' generalized claims that they were misled about the financial condition of Waste Management is an insufficient showing for [the] Court to hold a hearing about whether there was fraud in inducing the arbitration clause." Letter from Jeremy A. Berman, Esq., counsel for Waste Management, Mar. 3, 2000, at 5.

 The Resource Group asserts that the issue is to be resolved by application of Illinois law because of the agreement's choice-of-law provision. Waste Management does not address this issue. It is indeed true that the Court would be obliged to apply state law "concerning the validity, revocability, and enforceability of contracts generally" to determine whether Waste Management fraudulently induced

the arbitration agreement. *Doctor's Assocs., Inc. v. Distajo*, 107 F.3d 126, 134 (2d Cir.1997) (quoting *Perry v. Thomas*, 482 U.S. 483, 492 n. 9, 107 S.Ct. 2520, 96 L.Ed.2d 426).[12] However, state law is implicated only if the Court first determines, under the teaching of *Prima Paint*, that the attack is truly one that specifically implicates the validity of the arbitration clause. If state law were implicated, the Court would conduct the appropriate conflict-of-law analysis as between New York and Illinois law, and Waste Management's arguments in respect to issues such as arm's-length negotiations and disclosure would require analysis under the applicable state law.

The Court need not resort to state law to assess the issue of whether the Resource Group's contention that its primary reason for agreeing to the arbitration clause was because it relied on Waste Management's fraudulent representations as to its financial health. The Court does not believe that this contention can fairly be viewed as a discrete attack on the validity of the arbitration clause; rather, it is based upon the same alleged misrepresentations which underlie the Resource Group's general attack on the contract. As such, the Court, looking to federal law interpreting and applying *Prima Paint*, concludes that there is no viable claim of fraudulent inducement of the arbitration clause. In that respect, the Second Circuit's decision in *Campaniello* is apt.

In *Campaniello*, the plaintiffs claimed that defendants included an arbitrate-in-Italy clause in order to prevent plaintiffs from litigating in American courts. The plaintiffs specifically stated that if they had known of the defendants' intentions, they would not have agreed to the contract or to the arbitration clause. The Second Circuit did not believe that this was sufficient "to establish that the arbitration clause in particular was a tool used to further a scheme to defraud." *Campaniello*, 117 F.3d at 667. In so holding, the court interpreted *Prima Paint* to require "some substantial relationship between the fraud or misrepresentation and the arbitration clause in particular in order to protect the obvious distinction drawn in *Prima Paint* between the arbitrability of fraud relating to a contract generally and fraud in the inducement of the arbitration clause in particular." *Id.* The rationale for this holding was reinforced by the court's view of the "evidentiary trial that would have to be conducted to determine if there was fraud in the inducement of the arbitration clause." *Id.* As the Second Circuit stated:

> Since there is no fraud or misrepresentation that relates directly to the arbitration clause, the District Court would have to determine whether the appellees defrauded appellants into settling their case and accepting a sham contract with an arbitration clause; *in short, the District Court would have to adjudicate the entire fraud claim.*

*Id.* (emphasis supplied).

In a similar vein, the Court in the present case would have to determine, be it by an evidentiary trial or by application of principles of preclusion in light of the summary judgment decision in *Mowbray I*, whether Waste Management did indeed fraudulently misrepresent its financial health—an issue that goes to the validity of the entire contract and not just the arbitration clause. Therefore, since the financial misrepresentations relate to the contract in general, and not to the arbitration clause in particular, they cannot serve as a basis for the Resource Group's fraud-

---

**12.** By contrast, the issue of waiver of arbitration is decided under federal law since "the FAA creates a 'body of federal substantive law of arbitrability, applicable to any arbitration agreement within the coverage of the Act.'" *See Doctor's Assocs.*, 107 F.3d at 130 (quoting *Moses H. Cone Mem. Hosp.*, 460 U.S. 1, 24, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983)). Thus, "even the inclusion in the contract of a general choice-of-law clause does not require application of state law to arbitrability issues, unless it is clear that the parties intended state arbitration law to apply on a particular issue." *Doctor's Assocs., Inc.*, 107 F.3d at 131.

ulent inducement claim. *Campaniello*, 117 F.3d at 667.

The Resource Group's fraudulent inducement claim reduces itself, therefore, to the assertions in Kaiser's affidavit that Hulligan misrepresented that the arbitration clause was standard procedure, that Waste Management always included arbitration clauses in its agreements, and that "the arbitration agreement won't cost you anything." Lomangino Aff., ¶ 9. Even if it be assumed that these assertions were independent reasons directly related to the Resource Group's decision to agree to arbitration, thereby requiring analysis under state law, it is clear that none of these representations would serve as a basis for fraudulent inducement under either Illinois or New York law.[13] In each state, reasonable reliance would have to be established, *see Lama Holding Co. v. Smith Barney Inc.*, 88 N.Y.2d 413, 646 N.Y.S.2d 76, 80, 668 N.E.2d 1370 (1996); *Havoco of Am., Ltd. v. Sumitomo Corp. of Am.*, 971 F.2d 1332, 1341–42 (7th Cir.1992). In respect to the representations that the arbitration clause was standard procedure and always was included in Waste Management's agreements, it is implausible, given the degree of sophistication of the parties and the arm's-length nature of their negotiations, that the courts of either of these states would conclude that the Resource Group could reasonably rely on these statements. *See Siemens Solar Indus. v. Atlantic Richfield Co.*, 251 A.D.2d 82, 673 N.Y.S.2d 674, 674 (1st Dep't 1998); *General Electric Capital Corp. v. United States Trust Co. of N.Y.*, 238 A.D.2d 144, 655 N.Y.S.2d 505, 505 (1st Dep't 1997); *Stuart Silver Assocs. v. Baco Dev. Corp.*, 245 A.D.2d 96, 665 N.Y.S.2d 415, 417 (1st Dep't 1997); *Maier v. Maier*, 221 A.D.2d 193, 633 N.Y.S.2d 165, 166 (1st Dep't 1995); *Marine Midland Bank, N.A. v. Green*, 209 A.D.2d 288, 631 N.Y.S.2d 1, 2 (1st Dep't

1994); *GreatAmerica Leasing Corp. v. Cozzi Iron & Metal Inc.*, 76 F.Supp.2d 875, 879 (N.D.Ill.1999); *In re Marriage of Travlos*, 218 Ill.App.3d 1030, 1038, 578 N.E.2d 1267, 161 Ill.Dec. 621 (Ill.App.Ct. 1991).

 In respect to the assertion that the arbitration clause "won't cost you anything," this vague, general allegation, in contrast to the other fraud allegations, clearly does not satisfy the particularity requirement of Rule 9(b). *See* Fed.R.Civ. Pro. 9(b); *Stern v. General Electric Co.*, 924 F.2d 472, 476 n. 6 (2d Cir.1991) (court sitting in diversity jurisdiction must apply requirements of Rule 9(b)). In any event, both New York and Illinois law is to the same effect. *See* New York Civil Practice Law & Rules 3016; *Cramer v. Insurance Exchange Agency*, 174 Ill.2d 513, 221 Ill. Dec. 473, 675 N.E.2d 897, 905 (1996). Moreover, this allegation, even when considered in the light most favorable to the Resource Group, is at best a statement of opinion or one regarding possible future consequences if the arbitration clause were to be invoked. Fraud actions based on opinions or prognostications are not cognizable under New York or Illinois law. *See Chase v. Columbia Nat'l Corp.*, 832 F.Supp. 654, 661 (S.D.N.Y.1993); *George Backer Mgmt. Corp. v. Acme Quilting Co.*, 46 N.Y.2d 211, 413 N.Y.S.2d 135, 140, 385 N.E.2d 1062 (1978); *Platus Corp. Pension Plan v. Nazareth*, 705 N.Y.S.2d 649, 650 (2d Dep't 2000); *Austin Travel Group v. Karson*, 142 A.D.2d 539, 530 N.Y.S.2d 212, 213 (2d Dep't 1988); *FDIC v. Bruno*, 777 F.Supp. 1432, 1434 (N.D.Ill.1991); *In re Marriage of Travlos*, 161 Ill.Dec. 621, 578 N.E.2d at 1272.

**CONCLUSION**

1993). The absence of a conflict between New York and Illinois laws render a conflict-of-laws analysis academic. *See In re Allstate Ins. Co.*, 81 N.Y.2d 219, 597 N.Y.S.2d 904, 905, 613 N.E.2d 936 (1993).

---

**13.** As a federal court sitting in a diversity case in New York, the Court must apply New York's choice-of-law rules. *See Progressive Cas. Ins. Co. v. C.A. Reaseguradora Nacional De Venezuela*, 991 F.2d 42, 46 n. 6 (2d Cir.

The petition is denied in its entirety.[14]

---

**14.** Since the petition is denied, there is no need to rule on Waste Management's contention that section 4 of the FAA does not confer upon district courts the authority to stay arbitration, an issue which does not raise predicate jurisdictional questions since the section addresses remedial concerns. *See Steel Co. v. Citizens for a Better Env.*, 523 U.S. 83, 94–97, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998) (whether a statute grants a particular remedy is "not squarely directed at jurisdiction itself, but rather at the existence of a remedy for the alleged violation of … federal rights, which issue is not of the jurisdictional sort which the Court raises on its own motion." (internal quotation marks and citation omitted)).

If the Court had ruled otherwise on the waiver or fraudulent inducement issue, or if the "authority to stay" issue be deemed to invoke jurisdictional concerns, thereby requiring "that jurisdiction be established as a threshold matter" before addressing the merits, *Steel Co.*, 523 U.S. at 94, 118 S.Ct. 1003, the Court would undoubtedly have concluded that section 4 of the FAA could be employed to stay arbitration. *See Satcom Int'l Group PLC v. Orbcomm Int'l Partners, L.P.*, 49 F.Supp.2d 331, 342 (S.D.N.Y.1999), *aff'd*, 205 F.3d 1324, 1999 WL 1254091 (Table) (2d Cir. 1999) (noting, in so concluding, "that the Second Circuit has already affirmed district court decisions staying or enjoining arbitration proceedings without finding it necessary to articulate its basis for doing so"); *see also Societe Generale de Surveillance, S.A. v. Raytheon European Mgmt. & Sys. Co.*, 643 F.2d 863, 868 (1st Cir.1981) (Breyer, J.) ("[T]o enjoin a party from arbitrating where an agreement to arbitrate is absent is the concomitant of the power to compel arbitration where it is present.").