**SOCIETE NATIONALE ALGERIENNE POUR LA RECHERCHE, LA PRODUCTION, LE TRANSPORT, LA TRANSFORMATION et LA COMMERCIALISATION des HYDROCARBURES, An Algerian National Corporation, Appellant,**

v.

**DISTRIGAS CORPORATION, Appellee.**

Civ. A. No. 86–2014–Y.

United States District Court,
D. Massachusetts.

March 17, 1987.

Peter A. Fine, Choate, Hall & Stewart, Boston, Mass., appellant.

Frederick G. Fisher, Hale & Dorr, Boston, Mass., appellee.

## MEMORANDUM AND ORDER

YOUNG, District Judge.

In this appeal, the appellant, Societe Nationale Algerienne Pour La Recherche, La Production, Le Transport, La Transforma-tion et La Commercialisation des Hydrocarbures ("Sonatrach") challenges the ruling of the United States Bankruptcy Court, dated May 15, 1986, denying Sonatrach's Motion to Modify the Automatic Stay to allow Sonatrach to commence arbitration before the International Chamber of Commerce, in Geneva, Switzerland pursuant to the arbitration clause in its contract with appellee Distrigas Corporation ("Distrigas"). The Bankruptcy Court denied Sonatrach's original motion to modify the stay on the ground that the contractual arbitration clause was "moot" in view of the rejection by Distrigas of the contract in its entirety after filing for protection under Chapter 11 of the U.S. Bankruptcy Code, 11 U.S.C. § 101 et. seq. (1982).[1] Sonatrach, the national energy corporation of the Algerian government and the creditor in this bankruptcy dispute, seeks international arbitration in order to determine the damages resulting from the rejection by the debtor Distrigas of a twenty-year supply contract for the purchase and sale of Algerian liquified natural gas.[2]

For the reasons discussed below, this Court rules that Sonatrach is entitled to commence international arbitration, pursuant to the parties' contractual agreement, to resolve any outstanding questions of liability and damages in its breach of contract claim against Distrigas and directs

1. In a subsequent order of October 27, 1986, which is not the subject of the present appeal, the Bankruptcy Court denied a renewed motion by Sonatrach seeking relief from the automatic stay to arbitrate its rejection claim. The court held that international arbitration would be unduly burdensome to the estate in terms of increased time and expense.

   This Court also notes that, pursuant to its Order entered December 15, 1986, affirming the Bankruptcy Court's earlier Order of October 29, 1986, converting Distrigas from Chapter 11 to Chapter 7, Distrigas presently remains in liquidation status, pending appeal, having failed in its various attempts to present a viable reorganization plan for confirmation.

2. This dispute is but one battle in a much larger campaign. The parties' tactics here reflect their larger strategy. Sonatrach is the principal—indeed virtually the only—creditor of Distrigas. Sonatrach claims out-of-pocket losses of approximately twelve million dollars. Interestingly, the assets of Distrigas presently in the possession of the bankruptcy trustee are largely sufficient to satisfy this claim and those of the few other creditors as well as pay the costs of administration of the bankrupt's estate. There is no reasonable likelihood that Distrigas will ever have any additional assets or funds to meet any larger claims nor is there any likelihood that the trustee will uncover any additional assets or funds.

   What then, as a practical matter of commerce, is all the fuss about?

   Measuring the damages by the benefit-of-the-bargain, Sonatrach claims 1.2 billion dollars. While Distrigas could never satisfy such an enormous award, were one to be made, Distrigas is the wholly owned subsidiary of [Cabot Cabot & Forbes] and Sonatrach seems to believe that it may be better able to lift the corporate veil in an international forum than here at home. For its part, Distrigas prefers to remain veiled before a known Bankruptcy Judge rather than endure the uncertainties of an international tribunal of "three foreigners." Remarks of Distrigas' counsel in Hearing Transcript, November 5, 1986, p. 25.

that the automatic stay be modified accordingly.

■ There are two fundamental prongs to this appeal which must necessarily be addressed *seriatim.* The first presents the threshold issue of whether the arbitration clause contained in Article 17 of the Distrigas–Sonatrach contract survives the contract's rejection by the debtor in bankruptcy. Distrigas argues that its rejection of the contract effectively terminates the contract in its entirety while Sonatrach contends that rejection constitutes a material breach. What may initially appear to be a pointless semantic dispute actually has significant ramifications in this case as both "breach" and "termination" are employed as distinct terms of art under the Bankruptcy Code.

The rejection of an executory contract under the Bankruptcy Code receives explicit treatment in § 365(g). The Court begins its analysis of the statute heeding the familiar principle of statutory construction that requires courts to first examine the language of the statute. *See, e.g., Blue Chip Stamps v. Manor Drug Store,* 421 U.S. 723, 756, 95 S.Ct. 1917, 1935, 44 L.Ed.2d 539 (1974). Section 365(g) provides as follows:

> Except as provided in subsection (h)(2) and (i)(2) of this section, the *rejection* of an executory contract or unexpired lease of the debtor constitutes a *breach* of such contract or lease—
>
> (1) if such contract or lease has not been assumed under this section or under a plan confirmed under chapter 9, 11, or 13 of this title, immediately before the date of the filing of the petition. (emphasis added).

Significantly, at other points, including §§ 365(h)(1) and 365(i)(1), which immediately follow, the Code states that rejected executory contracts may be considered "terminated" under certain enumerated conditions. Thus, "[w]here the legal concept of termination is appropriate that term is used." *In re Storage Technology Corporation,* 53 B.R. 471, 474 (Bankr.D.Colo. 1985). The precise use of language strongly suggests that the relevant statutory provisions merit strict construction as it appears that "the drafters of § 365 were aware of the difference between a 'breach' and a 'termination'." *Blue Barn Associates v. Picnic 'N Chicken, Inc.,* 58 B.R. 523, 525 (Bankr.S.D.Cal.1986). In *Storage Technology,* 53 B.R. at 474, the court came to a similar conclusion: "A review of the overall structure of § 365 ... indicates that the words 'breach' and 'termination' were intended to have different meanings."

Accordingly, the issue of whether the contract's rejection should properly be considered "breach" or "termination" may not be dismissed as a mere technicality. If the contract is terminated upon rejection the present inquiry must necessarily come to a swift conclusion as neither party is required to perform under the inoperative agreement. *See* 5A A.L. Corbin, Corbin on Contracts, §§ 1229–30 (2d ed. 1964 & Supp. 1984). If, however, the contract is deemed breached, the nonbankrupt party is entitled to a pre-petition claim for damages against the bankrupt estate. 11 U.S.C. § 365(g)(1).

While there is not a vast body of case law that analyzes the semantic distinctions employed in § 365, the two recent bankruptcy opinions cited above provide well-reasoned interpretations of the controlling statutory language which comport with this Court's predilection for narrow and precise statutory construction. In *Storage Technology,* 53 B.R. at 475, the court, after carefully reviewing § 365 and the existing case law, concludes that "rejection of a lease does not have the conclusive effect of terminating the lease." Similarly, in its own careful analysis, the court in *Picnic 'N Chicken,* 58 B.R. at 526, adopts the *Storage Technology* approach, ruling that "the better-reasoned decisions hold that rejection by the debtor does not necessarily terminate a lease agreement for all purposes."

Distrigas' attempt to distinguish these persuasive cases from the instant situation on the basis that they involved leases and not executory contracts is misplaced. A lease agreement, as far as it involves "obligations which continue in the future," *In re Jolly,* 574 F.2d 349, 351 (6th Cir.), *cert.*

*denied,* 439 U.S. 929, 99 S.Ct. 316, 58 L.Ed. 2d 322 (1978), is a form of executory contract that may be easily analogized to the present situation. Moreover, as another court has observed, "unexpired leases have been expressly included within Section 365 of the Code to preclude any uncertainty as to whether an unexpired lease is an executory contract." *Hasset v. Revlon, Inc. (In re O.P.M. Leasing Services, Inc.),* 23 B.R. 104, 117 (Bankr.S.D.N.Y.1982).

This Court is equally unimpressed by Distrigas's reliance upon *Commercial Finance Limited v. Hawaii Dimensions, Inc.,* 47 B.R. 425 (D.Haw.1985), to rebut the sound reasoning employed by *Storage Technology* and *Picnic 'N Chicken.* The court in *Hawaii Dimensions* equates a lease's rejection with its termination based primarily upon a rather cursory statutory analysis driven perhaps more by concerns of equity than by the need to interpret rigorously the breach-termination distinction as identified in § 365(g), the controlling statutory section. The court stated that any contrary statutory interpretation "would unreasonably burden the lessor" under the facts of that case. *Hawaii Dimensions,* 47 B.R. at 427–28. Thus, the explanation offered in *Storage Technology,* 53 B.R. at 474, for the anomolous *Hawaii Dimensions* result rings true: "the potential for inequitable results appears to have [had] a large impact on the ultimate result reached [there]."

To be sure, this Court heartily approves of the general propositions, cited by Distrigas, that an executory contract must either be accepted or rejected in its entirety and the accompanying proposition that the parties to a contract may not selectively revive provisions in order to extract benefits at the other party's expense. Yet, these accepted principles of black letter law notwithstanding, a different tack is more appropriate with respect to arbitration clauses which represent the freely-negotiated method of dispute resolution selected *in advance* by the parties. As in the instant case, it may be safely assumed that arbitration clauses are not thoughtlessly incorporated into complex, international commercial contracts as mere ballast or as a meaningless nod in the direction of international comity. This assumption is further bolstered where both parties have equal bargaining power and are represented in their transactions by experienced and accomplished legal counsel.

In such circumstances, a strong argument can be made for construing arbitration agreements as "separable" from the principal contract even though they are physically embodied in the same instruments. Indeed, the First Circuit has expressed this preference and suggested that allowing an arbitration clause to be automatically invalidated along with the principal agreement would be akin to destroying "precisely what the parties had sought to create" as a dispute resolution device. *Lummus Company v. Commonwealth Oil Refining Company, Inc.,* 280 F.2d 915, 924 (1st Cir.), *cert. denied,* 364 U.S. 911, 81 S.Ct. 274, 5 L.Ed.2d 225 (1960); *see also Prima Paint Corp. v. Flood & Conklin Mfg. Co.,* 388 U.S. 395, 87 S.Ct. 1801, 18 L.Ed.2d 1270 (1967). This notion of separability is implicitly acknowledged in a well-established line of Massachusetts state court decisions which hold that even a contract's *termination* does not necessarily terminate arbitration provisions or other forms of dispute resolution procedure. *Mendez v. Trustees of Boston University,* 362 Mass. 353, 356, 285 N.E.2d 446 (1972) and cases cited therein.[3]

In view of the foregoing, this Court clears the first hurdle in the present appeal and rules that the arbitration provision survives the Distrigas rejection and retains its vitality as a viable method of alternative dispute resolution under the present circumstances.

---

**3.** In more general terms, a legal commentator has advanced the following conclusion on the "separability" doctrine:

It is now firmly established in the United States, as well as in many other countries, that an arbitration clause is considered a sep-

arable contract between the parties which survives as an obligation of the promisor even if the underlying contract is voidable.

Westbrook, *The Coming Encounter: International Arbitration and Bankruptcy,* 67 Minn.L.Rev. 595, 623 (1983).

■ With the arbitration clause still operational, the second—and certainly more far-reaching—issue raised in this appeal becomes ripe for resolution: the reconciliation of two important federal statutes, the Bankruptcy Code, 11 U.S.C. § 101 *et. seq.* and the Arbitration Act, 9 U.S.C. § 1 *et. seq.* (1982), the underlying policies of each coming here in the instant case into direct conflict. Distrigas argues that the bankruptcy court should properly retain jurisdiction over all matters pertaining to its on-going bankruptcy proceeding. Sonatrach contends, on the contrary, that an international arbitration tribunal be allowed to determine contract damages pursuant to the arbitration provision contained in the rejected supply contract. The statutory interaction inherent in the current dispute presents a conflict of near polar extremes: bankruptcy policy exerts an inexorable pull towards centralization while arbitration policy advocates a decentralized approach towards dispute resolution.[4] Reaching a satisfactory reconciliation between the two is no simple matter especially when each statute advances clear and unassailable legislative policies and comes well-armed with strong judicial approval. When confronted with a question of this nature, the Court is not assisted by the availability of any "bright line test" or controlling precedent. Indeed, in terms of existing precedent on this issue, this Court is left to mine a very thin vein of the law. The touchstones must be balance, pragmatism, and flexibility. Accordingly, any determination concerning the relative priority of conflicting federal statutes must be tailored to the facts of the individual case and, in essence, this Court perceives its role as one of balancing the prospective harms and benefits inherent in favoring any given legislative policy choice with fairness to the parties in reaching the most equitable solution.

At the outset, the respective policy considerations behind each statute merit brief discussion. The Bankruptcy Reform Act, codified at 11 U.S.C. § 101, was enacted in 1978 to promote several well-defined policy goals including the centralization of all bankruptcy matters in a specialized forum—the federal Bankruptcy Court— which was given exclusive jurisdiction over the bankrupt's affairs. *See Northern Pipeline Construction Co. v. Marathon Pipeline Co.,* 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982). By centralizing all disputes in the bankruptcy courts, Congress sought to ensure the orderly and expeditious rehabilitation or liquidation of debtors, taking special care, in enacting the automatic stay provisions of § 362, "to give the debtor and his creditor body a full, fair, speedy, and unhampered chance for reorganization." *Braniff Airways, Inc. v. United Air Lines, Inc.,* 33 B.R. 33, 34 (Bankr.N. D.Tex.1983).

The Federal Arbitration Act, 9 U.S.C. § 1 *et. seq.,* and its subsequent incorporation of the Convention of the Recognition and Enforcement of Foreign Arbitral Awards, 21 U.S.T. 2517 T.I.A.S. No. 6997 (acceded to by U.S. Sept. 1, 1970), seeks generally to overcome "the anachronistic judicial hostility to agreements to arbitrate" that American courts inherited from their English brethren. *Mitsubishi Motors Corporation v. Soler Chrysler Plymouth, Inc.,* 473 U.S. 614, 105 S.Ct. 3346, 3354 n. 14, 87 L.Ed.2d 444 (1985).[5] On a more practical level, the Act promotes neutrality and certainty in the adjudication of international commercial disputes and, at its very core, codifies the notion that arbitration agreements be placed "on the same footing" as private contractual arrangements and should be honored even at the expense of a court's

---

4. An excellent overview of the respective policies behind both statutes and the increasing prospects for their intersection and conflict is provided in Westbook, *supra* note 3, at 595–600.

5. The Supreme Court elaborated upon the historical roots of this hostility in *Scherk v. Alberto-Culver Co.,* 417 U.S. 506, 510 n. 4, 94 S.Ct. 2449, 2453 n. 4, 41 L.Ed.2d 270 (1974):

English courts traditionally considered irrevocable arbitration agreements as "ousting" the courts of jurisdiction.... This view was adopted by American courts as part of the common law up to the time of the adoption of the Arbitration Act.

being "ousted" from jurisdiction. *Mitsubishi*, 105 S.Ct. at 3353–54.

The federal bankruptcy courts, newly-vested with the requisite authority to deal with the specialized and increasingly complex area of bankruptcy law, are understandably reluctant to part with their broad jurisdictional sweep. Accordingly, the observation that "[t]he bankruptcy court does not ordinarily surrender its jurisdiction except under exceptional circumstances," *In re Brookhaven Textiles, Inc.*, 21 B.R. 204, 206 (Bankr.S.D.N.Y.1982), is amply supported by several bankruptcy court decisions in which the courts have found bankruptcy policy to supercede conflicting federal statutory policies including the pro-arbitration policy advanced under the Arbitration Act.[6] There is no uniform line of decision, however, as other bankruptcy courts have expressed markedly divergent views and have enforced arbitration agreements.[7] Yet, in general terms, it has been fairly stated that "[w]here compelling the arbitration of disputes conflicts with other important federal policies, the courts have frequently refused to order arbitration." *Bache Halsey Stuart, Inc. v. French*, 425 F.Supp. 1231, 1233 (D.C.Cir.1977); *see, e.g., Zimmerman v. Continental Airlines, Inc.*, 712 F.2d 55 (3rd Cir.1983), *cert. denied* 464 U.S. 1038, 104 S.Ct. 699, 79 L.Ed. 2d 165 (1984); *Allegaert v. Perot*, 548 F.2d 432 (2d Cir.1977), *cert. denied* 432 U.S. 910, 97 S.Ct. 2959, 53 L.Ed.2d 1084 (1977).

These decisions, however, while helpful and informative, are necessarily limited to their particular facts and do not control under the present factual circumstances, especially where the dispute contains a significant international dimension. The two most salient facts of the present case, as it now stands, which serve to distinguish it from the mainstream are the international character of the transaction and the pres-

ence of a failed Chapter 11 debtor. These characteristics are of substantial import. With regard to international arbitration agreements, for example, the United States Supreme Court has recently stated that the "emphatic" federal policy in favor of arbitration "applies with special force in the field of international commerce." *Mitsubishi*, 105 S.Ct. at 3357. Similarly, with the failure of Distrigas to reorganize successfully, one of the Bankruptcy Code's primary goals—"to give debtors a fresh start"—has already been frustrated. *Quinn v. CGR*, 48 B.R. 367, 369 (D.Colo. 1985).

Few courts have focused upon the precise interplay between bankruptcy policy and the policy favoring international arbitration. *Allen & Hein*, 59 B.R. 733 (Bankr. S.D.Cal.1986). Fewer still have involved a factual scenario similar to the present case. Only one decision, *Quinn*, bears a reasonably close resemblance and, while it should not control pursuant to this Court's stated philosophy that federal statutory conflicts need be resolved on a case-by-case basis, its reasoning is compelling and worthy of attention.

In *Quinn*, 48 B.R. 367 (D.Colo.1985), the trustee of a bankrupt United States corporation, Life Imaging Corporation, filed suit against a French corporation to collect money damages allegedly due under a distributorship agreement between the parties. Life Imaging's attempt to reorganize under Chapter 11 had not succeeded and it had started to liquidate. The defendant, CGR, moved for an order compelling arbitration of the damages issue under the distributorship agreement's arbitration provision. In support of its motion, CGR contended that Life Imaging's existing bankruptcy should not affect arbitration of the bankrupt's alleged contractual rights when the dispute presented, in the court's words,

---

**6.** *See Coar v. Brown*, 29 B.R. 806 (N.D.Ill.1983); *Braniff*, 33 B.R. 33 (Bankr.N.D.Tex.1983); *Brookhaven Textiles, Inc. v. Avondale Mills, Inc.*, 21 B.R. 204 (Bankr.S.D.N.Y.1982); *Sugarman v. Rouse Construction, Inc. (In re Technical Industries, Inc.)*, 21 B.R. 863 (Bankr.M.D.Tenn.1982); *Cross Electric Company, Inc. v. John Driggs Company, Inc.*, 9 B.R. 408 (Bankr.W.D.Va.1981).

**7.** *See Bender Shipbuilding and Repair Co., Inc. v. H.B. Morgan, Jr.*, 28 B.R. 3 (9th Cir. BAP 1983); *In re Allen & Hein, Incorporated*, 59 B.R. 733 (Bankr.S.D.Cal.1986); *Sterling Mining Company, Inc. v. Kilgore*, 21 B.R. 66 (Bankr.W.D.Va. 1982); *International Molders and Allied Workers Union v. Smith Jones, Inc.*, 17 B.R. 126 (Bankr. D.Minn.1981).

"no issues of sensitive or pressing public policy." *Id.* at 369.

The court decided in favor of ordering arbitration in that situation for two primary reasons: the Bankruptcy Code's major policy goal of providing the debtor with an opportunity to rehabilitate had been "defeated ... by the proven inability of the debtor to reorganize and continue a revitalized business life." *Id.* Moreover, the court could not identify any significant bankruptcy or public policy issues present within the dispute over contract damages, stating that international arbitration is indicated especially when no "complex or weighty matters of federal law are present." *Id.*

The *Quinn* situation is similar to the instant case where only the discrete issue of contract damages will be submitted to arbitration. The foreign tribunal will thus not have to interpret and adjudicate any core bankruptcy issues such as creditors' priority, preferential transfers and offsets that were present in other cases where arbitration was denied. *See, e.g., Allegaert,* 548 F.2d 432 (2d Cir.1977); *Braniff,* 33 B.R. 33 (Bankr.N.D.Tex.1983). Further, while an expeditious and economical resolution is always in everyone's interest, the fact that a debtor has failed at Chapter 11 reorganization—much like a critically ill patient who has finally succumbed despite all resuscitation efforts—removes some of the immediate time sensitivity that usually accompanies Chapter 11 situations. Thus, the cases upon which Distrigas relies that have favored the bankruptcy court's retaining jurisdiction—especially *Braniff,* 33 B.R. 33 (Bankr.N.D.Tex.1983), *Banque Francaise du Commerce Exterieur v. Rio Grande Trading Inc.,* 17 B.R. 134 (Bankr. S.D.Tex.1981), and *Kenner Products Company v. Societe Fonciere et Financiere Agache–Willot,* 532 F.Supp. 478 (S.D.N.Y. 1982)—stand in stark contrast. The *Braniff* decision, for example, involved a debtor airline that was actively involved in Chapter 11 reorganization. Indeed, in *Braniff,* 33 B.R. at 34, the court, in its lucid exposition of the Bankruptcy Code's broad powers, noted that the legislative intent behind such policy was to provide both debtors and creditors with "an unhampered chance for reorganization," and concluded that this policy superceded arbitration especially when the crux of the dispute involved the fundamental bankruptcy issue of the distribution of debtor's assets and creditor priority. The court further posited that arbitration was not workable since "[r]equiring the debtor to resort to arbitration would delay the efforts to reorganize" and the debtor was on a precariously "tight schedule." *Id.* at 36.

No such constraints exist in the present case which, like *Quinn,* involves a debtor entering liquidation and a dispute primarily concerning the valuation of damages in a breach of contract situation.

The line of decisions which conclusively tip the judicial scale in favor of arbitration, however, are not bankruptcy decisions but are rather a line of United States Supreme Court opinions which enthusiastically endorse an internationalist approach towards commercial disputes involving foreign entities. These decisions—*The Bremen v. Zapata Off-Shore Co.,* 407 U.S. 1, 92 S.Ct. 1907, 32 L.Ed.2d 513 (1972) (forum selection clause in international commercial contract enforced); *Scherk v. Alberto–Culver Co.,* 417 U.S. 506, 94 S.Ct. 2449, 41 L.Ed.2d 270 (1974) (international arbitration clause held enforceable when in conflict with federal securities laws); and most recently, *Mitsubishi,* 473 U.S. 614, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985) (international arbitration clause held enforceable when in conflict with federal anti-trust laws)—eschew the parochial tendencies of domestic tribunals in retaining jurisdiction over international commercial disputes. The Supreme Court powerfully advocates the need for international comity in an increasingly interdependent world. Such respect is especially important, in this Court's view, when parties mutually agree to be bound by freely-negotiated contracts.

The Supreme Court in *Zapata* employed convincing language decrying provincialism and this language has been influential in guiding the later *Scherk* and *Mitsubishi* decisions where, in fact, it was quoted verbatim:

The expansion of American business and industry will hardly be encouraged if,

notwithstanding solemn contracts, we insist on a parochial concept that all disputes must be resolved under our laws and in our courts.... We cannot have trade and commerce in world markets and international waters exclusively on our terms, governed by our laws, and resolved in our courts.

*Zapata,* 407 U.S. at 9, 92 S.Ct. at 1912; *Scherk,* 417 U.S. at 519, 94 S.Ct. at 2457; *Mitsubishi,* 105 S.Ct. at 3356.

Distrigas makes much of the so-called "public policy" exception articulated in *Zapata,* arguing that it applies to the instant case. The "public policy" exception is described as follows:

A contractual choice-of-forum clause should be held unenforceable if enforcement would contravene a strong public policy of the forum in which suit is brought, whether declared by statute or by judicial decision.

*Zapata,* 407 U.S. at 15, 92 S.Ct. at 1916.

Distrigas' reliance is misplaced as the Supreme Court went on to elaborate that the "public policy" exception, while applicable in strictly domestic situations, would not control in international commercial matters. *Id.* at 16, 92 S.Ct. at 1916. Furthermore, even if the "public policy" exception could apply to the instant international situation, the issues of contract damages which Sonatrach seeks to arbitrate, impinge very little on the Bankruptcy Code. In order to nullify an arbitration clause, the Supreme Court in *Zapata* would demand that the Debtor demonstrate some "compelling and countervailing reason" that it should be dishonored, especially when such choice was "made in an arm's-length negotiation by experienced and sophisticated businessmen." *Id.* at 12, 92 S.Ct. at 1914. Distrigas has failed to meet this standard.

In similar fashion, the Supreme Court in *Scherk,* 417 U.S. at 519, 94 S.Ct. at 2457, chose to respect an international arbitration agreement noting that the invalidation of such an agreement would not only allow the respondent "to repudiate its solemn promise," but could lead to the creation of "a legal no-man's land" that would have an undeniably chilling effect upon international commerce. The Court concluded:

A parochial refusal by the courts of one country to enforce an international arbitration agreement would not only frustrate [the orderliness and predictability essential to any international business transactions, as well as other purposes,] but would invite unseemly and mutually destructive jockeying by the parties to secure tactical litigation advantages.

*Id.* at 516–17, 94 S.Ct. at 2456.

The trilogy culminates in *Mitsubishi,* 105 S.Ct. at 3356, a decision in which the Supreme Court relied heavily upon the rationale advanced in the preceeding decisions, stating that they "establish a strong presumption in favor of enforcement of freely negotiated contractual choice-of-forum provisions." The Court came to the following unequivocal conclusion:

As in *Scherk,* we conclude that concerns of international comity, respect for the capacities of foreign and transnational tribunals and sensitivity to the need of the international commercial system for predictability in the resolution of disputes require that we enforce the parties' agreement, *even assuming that a contrary result would be forthcoming in a domestic context.*

*Mitsubishi,* 105 S.Ct. at 3355 (citations omitted) (emphasis added).

Taken together, these decisions erect a compelling argument in favor of requiring Distrigas—as a "representative of the American business community," *Mitsubishi,* 105 S.Ct. at 3361 (citing *Alberto–Culver v. Scherk,* 484 F.2d 611, 620 [7th Cir. 1973])—to honor its bargain and proceed with international arbitration. Although the Supreme Court has not specifically addressed the clash of *bankruptcy* and international arbitration, it would be unrealistic indeed to argue that bankruptcy principles are qualitatively more fundamental to our capitalistic democratic system than either the securities laws or anti-trust policy.[8]

■ In weighing the strong public policy favoring international arbitration with any countervailing potential harm to bankruptcy policy upon the present facts, this Court

---

**8.** This is not to say, however, that the Supreme Court's holdings mean that international arbi-

finds the scales weighted in favor of arbitration. As discussed earlier, no major bankruptcy issues will be implicated in valuing contract damages and the international arbitration panel requires no special expertise to accomplish their task. While international arbitration will require a temporary and limited incursion into the Bankruptcy Court's exclusive jurisdictional bailiwick,[9] no bankruptcy policies will suffer adverse impact. Conversely, the very image of the united States in the international business community stands to be tarnished. It is important and necessary for the United States to hold its domiciliaries to their bargains and not allow them to escape their commercial obligations by ducking into statutory safe harbors.[10] Rather, our country should take special pains to project those qualities of honesty and fairness which are essential parts of the traditional American character and be perceived as a fair and equal player in the global marketplace, particularly in our commercial relations with the underdeveloped world. Any additional time and expense required by the international arbitration process—which is only speculative at this point—will be overshadowed in importance by the virtues of having the parties abide by their commitments.

Therefore, Sonatrach's Motion to Modify the Stay and proceed with international arbitration is ALLOWED for the reasons stated above.

SO ORDERED.

tration is the appropriate remedy in all circumstances. There may be disputes where arbitration is decidedly unsuitable or where Congress has undertaken "to specify categories of claims it wishes to reserve for decision by our own courts without contravening this Nation's obligations under the Convention." *Mitsubishi*, 105 S.Ct. at 3360 n. 21. Neither of these factors exist in the present case.

9. Once arbitration has commenced, United States courts have the opportunity at the arbitration award enforcement stage "to ensure that the legitimate interest in the enforcement of the ... laws has been addressed" and are entitled under the Convention "to refuse enforcement of

an award" where such enforcement would be "contrary to the public policy of that country." *Mitsubishi*, 105 S.Ct. at 3360. It is not at all clear, for example, that piercing the Distrigas corporate veil is within the scope of the matters referred to international arbitration. It is the Bankruptcy Court in this district that may well have to initially determine that matter. *See* Restatement (Second) of Judgments § 84(3)(a) (1982).

10. This Court notes that counsel for Distrigas, displaying admirable candor, conceded to using the Bankruptcy Court "as a vehicle to avoid arbitration." Hearing Transcript, December 4, 1986, p. 6.