In re **NU–KOTE HOLDING, INC.,** Nukote Imperial, Ltd., Nu-kote International, Inc., Nu-kote Imaging International, Inc., International Communication Materials, Inc., Future Graphics, Inc., Nu-kote Latin America, Inc., Debtors.

**Pelikan Holding AG, Plaintiff,**

v.

**Nu–Kote Holding, Inc. and Citibank, NA, Defendants.**

**Bankruptcy No. 398–10600.**
**Adversary No. 300–0096A.**

United States Bankruptcy Court, M.D. Tennessee.

Jan. 5, 2001.

Frank J. Wright, William T. Burke, Jr., Robert T. DeMarco, Hance Scarborough Wright, Dallas, TX, Craig V. Gabbert, Jr., Barbara D. Holmes, Harwell, Howard, Hyne, Gabbert & Manner, P.C., Nashville, for Debtor.

William L. Norton, III, Boult, Cummings, Conners & Berry, PLC, Nashville, Wilson P. Funkhouser, Vance L. Liebman, Levin & Funkhouser, Ltd., Chicago, IL, for Pelikan Holding AG.

Robert H. Waldschmidt, Howell & Fisher, PLLC, Nashville, for Citibank, N.A.

## MEMORANDUM

KEITH M. LUNDIN, Bankruptcy Judge.

This is a declaratory action to determine the scope and enforceability of arbitration clauses in contracts between a now reorganized Chapter 11 debtor and a Swiss holding company that sold assets and stock to the Debtor four years before bankruptcy. The arbitration provisions are broadly applicable and enforceable. The following are findings of fact and conclusions of law. FED. R. BANKR. P. 7052.

### FACTS

By connected agreements beginning in November, 1994, Pelikan Holding AG ("Pelikan") sold to Nu-kote Holding, Inc. ("Nu-kote" or "Debtor") assets and stock relating to the development, production and marketing of supplies for printing devices. Among many obligations, the agreements required Pelikan to fund a $2.5 million Environmental Escrow Fund to indemnify Nu-kote for environmental liabilities related to facilities acquired from Pelikan.

Nu-kote filed Chapter 11 in November, 1998. Pelikan filed five proofs of claim:

1. An Accounts Receivable claim for $894,341 for money received by Nu-kote on accounts receivable owed to Pelikan.

2. An Excess Tax proof of claim for $2,424,639 arising from the tax con-

sequences of transactions required by the agreements.

3. An Invoices claim for $35,767 for equipment Nu-kote purchased pursuant to invoices that may have been assigned to Pelikan after the petition.

4. A 401(k) claim for $160,920 for pension contributions and closing costs assumed by Nu-kote.

5. A fifth claim for improper use of Pelikan trademarks that has been resolved by the parties.

Nu-kote made demand for payments from the Environmental Escrow Fund. Pelikan objected on grounds including that Pelikan is excused from its environmental indemnity by Nu-kote's breaches of the agreements and that Pelikan can setoff or recoup from the Environmental Escrow Fund its claims against Nu-kote. The Debtor disputes each Pelikan claim and earnestly resists the notion that any Pelikan claim can be recovered from the Environmental Escrow Fund by any theory.

Preliminary to the substance of these questions, Pelikan filed this complaint for a declaration that the agreements require arbitration of all disputes between the parties.

The agreements contain three arbitration provisions. There is a general arbitration provision in section 9.7.4 of the Purchase Agreement:

9.7.4. *Governing Law; Arbitration.* (a) Except as provided in paragraph (b) below, this Agreement shall be governed by and construed in accordance with the laws of the State of New York (regardless of the laws that might otherwise govern under applicable principles of conflicts of law).

(b) *Except as provided in Section 4.2.6,[1] 7.6[2] and 9.7.10,[3] any controversy or claim arising out of or relating to this Agreement or any breach thereof shall be settled by arbitration.* The arbitration shall be held in New York, New York and, except to the extent inconsistent with this Agreement, shall be conducted in accordance with the International Arbitration Rules of the American Arbitration Association in effect at the time of the arbitration. The arbitration shall be conducted in the English Language. The arbitration proceedings, all documents and all testimony, written or oral, produced in connection therewith, and the arbitration award shall be confidential. In such an arbitration, the arbitrators shall permit discovery of documents and witnesses to the extent permitted under Federal Rules of Civil Procedure 26 through 34.

The arbitration panel shall consist of three arbitrators....

In addition to the authority conferred on the arbitrators by the International Arbitration Rules of the American Arbitration Association and by law, the arbitrators shall have the authority to order such discovery and production of documents in addition to that provided above, and to make such orders for interim relief, including injunctive relief, as they may deem just and equitable. Notwithstanding the foregoing, the arbitrators shall be only empowered to interpret and apply the terms of this Agreement, and shall not be empowered to revise or amend any provision in this Agreement, not to make a decision based on any such revision or amendment.

---

1. Section 4.2.6 addresses an environmental survey by Nu-kote's environmental consultants to set forth the "Material Environmental Cost" to clean up covered environmental items. Pelikan was entitled to dispute the items, and if the parties could not resolve the dispute, they were to jointly retain an independent firm of environmental consultants to deliver an environmental adjustment certificate that would be final and binding upon Nu-kote and Pelikan.

2. See below.

3. See below.

The arbitral award may grant any relief deemed by the arbitrators to be just and equitable, including, without limitation, specific performance. The arbitral award shall state the reasons for the award and relief granted, shall be final and binding on the parties to the arbitration, and may include an award of costs, including reasonable attorneys' fees and disbursements. Any award rendered may be confirmed, judgment upon any award rendered may be entered and such award of the judgment thereon may be enforced in any court of any state or country having the jurisdiction over the parties and/or their assets. The parties hereto expressly waive all rights, whatsoever to file an appeal against or otherwise to challenge any award by the arbitrator(s) hereunder, provided that the foregoing shall not limit the rights of either party to bring a proceeding in any applicable jurisdiction to confirm, enforce or enter judgment upon such award (and the rights of the other party, if such proceeding is brought, to contest such confirmation, enforcement or entry of judgment, but only to the extent permitted by the United Nations Convention of Recognition and Enforcement of Foreign Arbitral Awards (1958)).

(Pl.Ex. A; Purchase Agreement § 9.7.4.)

The second arbitration provision, section 9.7.10 of the Purchase Agreement, addresses environmental disputes:

9.7.10. *Environmental Dispute Resolution Mechanism.* Except as otherwise provided in the Escrow Agreement, any controversy or claim arising out of or relating to Pelikan's indemnification obligations to Nu-kote for Environmental Liabilities and Costs under this Agreement shall be resolved as follows: (a) the parties shall in good faith attempt to negotiate a settlement of the dispute, (b) if the parties are unable to negotiate a resolution of the dispute within thirty days of the date upon which either party delivers written notice of a dispute to the other, the dispute shall be submitted, as soon as practicable thereafter, to an independent firm of environmental consultants of internationally recognized standing reasonably satisfactory to Pelikan and Nu-kote (the "Environmental Dispute Consultants"), (c) the parties shall present their arguments to the Environmental Dispute Consultants within fifteen days after submission of the dispute to the Environment Dispute Consultants, (d) the Environmental Dispute Consultants shall resolve the dispute, in a fair and equitable manner and in accordance with the applicable Environmental Laws, within thirty days after the parties have presented their arguments to the Environmental Dispute Consultants, whose decision shall be final, conclusive and binding on the parties, (e) any payment to be made as a result of the resolution of a dispute shall be made, and any other action to be taken as a result of the resolution of a dispute shall be taken, on or before the later of (i) the date on which such payment or action would otherwise be required or (ii) the tenth business day following the date on which the dispute is resolved (in the case of a dispute resolved by the Environmental Dispute Consultants, such date being the date on which the parties receive written notice from the Environmental Dispute Consultants of their resolution) and (f) the fees and expenses of the Environmental Dispute consultants in resolving a dispute shall be borne equally by Pelikan and Nu-kote or as the environmental Dispute Consultants shall award.

(Pl.Ex. A; Purchase Agreement § 9.7.10.)

The third arbitration provision concerns tax disputes. The Excess Tax Cost Agreement provides that "[a]ny disagreement between Nu-kote and Pelikan as to the determination of Excess Tax Costs ... shall be resolved pursuant to the Tax Dispute Resolution Mechanism[:]"

7.6. *Tax Dispute Resolution Mechanism.* Wherever in this Article VII it

shall be provided that a dispute shall be resolved pursuant to the "Tax Dispute Resolution Mechanism," such dispute shall be resolved as follows: (a) the parties shall in good faith attempt to negotiate a settlement of the dispute, (b) if the parties are unable to negotiate a resolution of the dispute within 30 days after notice by either party to the other, the dispute shall be submitted, as soon as practicable thereafter, to the national office of KPMG Peat Marwick or other independent accountants of internationally recognized standing reasonably satisfactory to Pelikan and Nu-kote (the "Tax Dispute Accountants"), (c) the parties shall present their arguments to the Tax dispute Accountants within 15 days after submission of the dispute to the Tax Dispute Accountants, (d) the Tax Dispute Accountants shall resolve the dispute, in a fair and equitable manner and in accordance with the applicable Tax law and this Agreement, within 30 days after the parties have presented their arguments to the Tax Dispute Accountants, whose decision shall be final, conclusive and binding on the parties, (e) any payment to be made as a result of the resolution of a dispute shall be made, and any other action to be taken as a result of the resolution of a dispute shall be taken, on or before the later of (i) the date on which such payment or action would otherwise be required or (ii) the tenth day following the date on which the dispute is resolved (in the case of a dispute resolved by the Tax Dispute Accountants, such date being the date on which the parties receive written notice from the Tax Dispute Accountants of their resolution) and (f) the fees and expenses of the Tax Dispute Accountants in resolving a dispute shall be borne equally by Pelikan and Nu-kote.

(Pl.Ex. A; Purchase Agreement § 7.6.)

## DISCUSSION

When asked to suspend other court proceedings and compel arbitration, the trial courts of the Sixth Circuit have been instructed to proceed as follows:

> [F]irst, it must determine whether the parties agreed to arbitrate; second, it must determine the scope of that agreement; third, if federal statutory claims are asserted, it must consider whether Congress intended those claims to be nonarbitrable; and fourth, if the court concludes that some, but not all, of the claims in the action are subject to arbitration, it must determine whether to stay the remainder of the proceedings pending arbitration.

*Stout v. Byrider,* 228 F.3d 709, 714 (6th Cir.2000). The Sixth Circuit has stated the general rule that:

> Courts are to examine the language of the contract in light of the strong federal policy in favor of arbitration. *See* [*Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.,* 473 U.S. 614, 626, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985) ]; *Arnold v. Arnold,* 920 F.2d 1269, 1281 (6th Cir.1990). Likewise, any ambiguities in the contract or doubts as to the parties' intentions should be resolved in favor of arbitration. *See Soler Chrysler–Plymouth,* 473 U.S. at 626, 105 S.Ct. 3346.

*Id.*

## DISTRIBUTIONS FROM THE ENVIRONMENTAL ESCROW FUND

 Pelikan raises two kinds of disputes with respect to distributions from the Environmental Escrow Fund:

1. Pelikan disputes the facts of environmental damages and remediation and claims that Nu-kote did not follow proper procedures for seeking indemnity.

2. If there is environmental liability that triggers Nu-kote's rights in the Environmental Escrow Fund, Nu-kote is not entitled to distributions because Pelikan has setoff and recoupment claims unrelated to environmental damages or remediation

that exceed Nu-kote's rights in the Environmental Escrow Fund.

Disputes of the first kind must be arbitrated pursuant to the Environmental Dispute Resolution Mechanism in section 9.7.10 of the Purchase Agreement: "any controversy or claim arising out of or relating to Pelikan's indemnification obligations to Nu-kote for Environmental Liabilities and Costs under this Agreement shall be resolved by a panel of internationally recognized environmental consultants." Section 14(a)[4] of the related Escrow Agreement clearly states, with respect to any objection to disbursement from the Environmental Escrow Fund, Pelikan's sole remedy is to invoke the Dispute Resolution Mechanism in section 9.7.10 of the Purchase Agreement. The facts of environmental damage and remediation and the procedures for seeking distributions from the Environmental Escrow Fund on account of environmental claims are matters the parties agreed to resolve under the Environmental Dispute Resolution Mechanism in section 9.7.10.

Disputes of the second variety—Pelikan's assertion of setoff and recoupment rights in the Environmental Escrow Fund based on claims that are unrelated to environmental damages or remediation—fall squarely within the general arbitration provisions of section 9.7.4 of the Purchase Agreement: "Except as provided in Sec-

tion 4.2.6 [the Final Environmental Certificate], 7.6 [tax disputes] and 9.7.10 [environmental disputes], any controversy or claim arising out of or relating to [the Purchase Agreement] or any breach there of shall be settled by arbitration."

In support of this conclusion, section 17(e) of the Escrow Agreement provides: "Any controversy or claim arising out of or relating to this Agreement or any breach hereof shall be settled by arbitration pursuant to Section 9.7.4 of the Purchase Agreement." The exception in section 9.7.4 for controversies and claims provided in section 9.7.10 carves out the Environmental Dispute Resolution Mechanism as the appropriate arbitration procedures for disputes related to environmental damages and remediation. Thus, the reference in section 17(e) of the Escrow Agreement to arbitration under section 9.7.4 requires that any controversy with respect to the Escrow Agreement that is not covered by section 9.7.10 is subject to the general arbitration provisions of section 9.7.4.

Pelikan's setoff and recoupment claims cannot be characterized as "arising out of or relating to Pelikan's indemnification obligations to Nu-kote for environmental liabilities and costs" for purposes of section 9.7.10. Pelikan's setoff and recoupment arguments "arise out of and relate to" alleged breaches of the agreements that do not involve environmental liabilities and costs. Whether other breaches can be

---

**4.** Section 14(a) of the Escrow Agreement provides:

*Disputes Involving Escrow Agent.* (a) If any dispute or disagreement should arise among the parties hereto or any other party with respect to the Escrow Funds or this Agreement or if the Escrow Agent in good faith is in doubt as to what actions should be taken hereunder, the Escrow Agent will have the absolute right at its election to do either or both of the following:

(i) withhold or stop all further performance under this Agreement and all instructions received in connection herewith until the Escrow Agent has received a written agreement executed by the other parties hereto directing delivery of the Escrow Funds or a final nonappealable order of a court of competent jur-

isdiction directing delivery of the Escrow Funds; or

(ii) file a suit in interpleader and obtain an order from a court of appropriate jurisdiction requiring all persons involved to litigate in court, submit to arbitration or otherwise mediate their respective claims arising out of or in connection with the Escrow Funds;

*provided* that this Section 14 shall not apply to any disputes arising form objections made by Pelikan to the disbursement of Escrow Funds under Sections 6(a), the Escrow Agent shall have the right and the obligation to disregard any such objection, and Pelikan's sole remedy shall be to invoke the dispute resolution mechanism set forth in Section 9.7.10 of the Purchase Agreement.

remedied through an equitable assault on the Environmental Escrow Fund is a question that falls within the arbitration required by section 9.7.4.

Section 17(f) [5] of the Escrow Agreement does not require a contrary result. Found among the "Miscellaneous" provisions of the Escrow Agreement, section 17(f) fixes jurisdiction in New York for any action by or against the escrow agent with respect to the Escrow Agreement. Section 17(f) does not purport to trump the explicit arbitration requirements in section 14(a) of the same Escrow Agreement. Section 17(e) of the Escrow Agreement specifically binds the parties to look through section 9.7.4 to the Arbitration Dispute Resolution Mechanisms in section 9.7.10. That the escrow agent is nominally named as a defendant in this action does not defeat Pelikan's arguments with respect to the scope or applicability of the arbitration provisions in the agreements. Nu-kote observed in preliminary matters in this adversary proceeding that the parties have waived any right to venue in New York City to determine the issues raised in this declaratory action.

### DISPUTED EXCESS TAX COSTS

■ The Excess Tax Costs Agreement directs that "any disagreement as to the determination of excess tax costs" is subject to resolution under the Tax Dispute Resolution Mechanism in section 7.6 of the Purchase Agreement. Any excess tax cost liability is appropriately determined by arbitration in the manner described in section 7.6.

**5.** Section 17(f) of the Escrow Agreement provides:

*Submission to Jurisdiction.* The parties hereto hereby irrevocably submit to the jurisdiction of any New York State or federal court sitting in New York City in any action or proceeding brought by or against the Escrow Agent and arising out of or relating to this Escrow Agreement, and the parties hereby irrevocably agree that all claims in respect of such action or proceeding arising out of or

The Debtor's failure to make payments under the Excess Tax Costs Agreement constitutes the largest breach of the agreements alleged by Pelikan. Whether Nukote is liable to Pelikan for excess tax costs, the appropriate tax rate for determining excess tax costs and whether Pelikan exercised all reasonable measures to reduce the amount of its U.S. corporate income tax are matters that fall within the Tax Dispute Resolution Mechanism in section 7.6.

However, for the reasons stated above, the Tax Dispute Resolution Mechanism is not the appropriate forum for resolution of Pelikan's argument that it can setoff or recoup excess tax costs from the Environmental Escrow Fund. Any such setoff or recoupment is not a "disagreement as to the determination of excess tax costs" but rather is a "controversy or claim arising out of or relating to [the Purchase Agreement] or any breach thereof" which "shall be settled by arbitration" consistent with the general arbitration provisions of section 9.7.4.

### OTHER DISPUTED CLAIMS

The remaining disputes—the Accounts Receivable claim, the 401(k) claim, the Invoices claim, other allegations of breach of the agreements and the associated setoff and recoupment arguments—are covered by the general arbitration provisions of section 9.7.4. The exceptions in section 9.7.4 do not apply to any of these other disputes. These other disputes all "aris[e] out of or relat[e] to" the Purchase Agreement "or any breach thereof" and do not fall within the Environmental Dispute Res-

relating to this Escrow Agreement shall be heard and determined in such a New York State or federal court. The parties hereby consent to and grant to any such court jurisdiction over the persons of such parties and over the subject matter of any such dispute and agree that delivery or mailing of any process or other papers in the manner provided herein above, or in such other manner as may be permitted by law, shall be valid and sufficient service thereof.

olution Mechanism or the Tax Dispute Resolution Mechanism.

### ENFORCEMENT OF ARBITRATION PROVISIONS

■ It has been twenty years since the Sixth Circuit directly addressed the enforceability of an arbitration clause in the bankruptcy context. In a case decided under the former Bankruptcy Act, the Sixth Circuit found no abuse of discretion when a bankruptcy court refused to enforce an arbitration provision in litigation by a bankruptcy trustee to recover under a partially completed construction contract. *Cuvrell v. Mazur (In re F & T Contractors, Inc.)*, 649 F.2d 1229 (6th Cir.1981).

*Cuvrell* could be read to permit bankruptcy courts wide discretion to invalidate arbitration clauses in disputes involving the collection of assets for the bankruptcy estate. But *Cuvrell* does not address the Federal Arbitration Act. *See* 9 U.S.C. §§ 2 & 3. And as related by Bankruptcy Judge Spector in *Barkman, Inc. v. Granger Construction Co., Inc. (In re James P. Barkman, Inc.)*, 170 B.R. 321 (Bankr.E.D.Mich. 1994), two decades of Supreme Court arbitration jurisprudence[6] since *Cuvrell* strongly counsels that the Sixth Circuit would now embrace the decisions of other circuits that have enhanced the enforceability of arbitration clauses in bankruptcy proceedings.

Contractual arbitration agreements are governed by the Federal Arbitration Act ("FAA"). The FAA provides:

A written provision in ... a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

9 U.S.C. § 2.

If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement, providing the applicant for the stay in not in default in proceeding with such arbitration.

9 U.S.C. § 3.

It is now said that the party opposing enforcement of an arbitration agreement bears the "burden of showing that the text, legislative history, or purpose of the Bankruptcy Code conflicts with the enforcement of an arbitration clause." *Hays & Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 885 F.2d 1149, 1156 (3d Cir.1989). *See Slipped Disc Inc. v. CD Warehouse Inc. (In re Slipped Disc Inc.)*, 245 B.R. 342, 344 (Bankr.N.D.Iowa 2000). "[I]f Congress did intend to limit or prohibit waiver of a judicial forum for a particular claim, such an intent will be deducible from [the statute's] text or legislative history, or from an inherent conflict between arbitration and the statute's underlying purposes." *Shearson/Am. Express Inc. v. McMahon*, 482 U.S. 220, 226, 107 S.Ct. 2332, 96 L.Ed.2d 185 (1987) (internal quotations and citations omitted). *See also Green Tree Fin. Corp.-Ala. v. Randolph*, 531 U.S. 79, 121 S.Ct. 513, 516, 148 L.Ed.2d 373 (2000) ("[F]ederal statutory claims can be appropriately resolved through arbitration...." [E]ven claims arising under a statute designed to further

---

**6.** See, most recently, *Green Tree Financial Corp.-Alabama v. Randolph*, 531 U.S. 79, 121 S.Ct. 513, 148 L.Ed.2d 373 (2000).

important social policies may be arbitrated because "so long as the prospective litigant effectively may vindicate (his or her) statutory causes of action in the arbitral forum," the statute serves its functions.) (footnotes and citations omitted).

■ Reported cases from other circuits suggest at least eight factors to consider to determine whether to enforce contractual arbitration in bankruptcy: 1) Whether the arbitration proceeding was commenced prepetition; 2) whether the party seeking arbitration has formally appeared in the bankruptcy case; 3) whether the arbitrator has special knowledge or expertise which would be helpful to the resolution of the disputed issues; 4) whether there is a strong likelihood that the debtor will confirm a plan; 5) whether there is an international arbitration provision; 6) the likelihood of piecemeal litigation; 7) whether the issue to be arbitrated is core or noncore; and 8) what impact resolution of the issue will have on the bankruptcy estate. *Insurance Co. of N.A. v. NGC Settlement Trust & Asbestos Claims Management Corp. (In re National Gypsum Co.),* 118 F.3d 1056, 1065–68 (5th Cir.1997); *In re Trident Shipworks, Inc.,* 243 B.R. 130, 133–34 (Bankr.M.D.Fla.1999); *Geron v. Schulman (In re Manshul Constr. Corp.),* 225 B.R. 41, 47 (Bankr.S.D.N.Y.1998); *In re Spectrum Info. Techs., Inc.,* 183 B.R. 360, 363–64 (Bankr.E.D.N.Y.1995); *Unsecured Creditors' Comm. of Dollar Corp. v. Hyundai Co. (In re Dollar Corp.),* 139 B.R. 192, 196 (Bankr.E.D.Mich.1992); *Societe Nationale Algerienne Pour La Recherche, Le Transport, La Transformation et La Commercialisation des Hydrocarbures v. Distrigas Corp.,* 80 B.R. 606, 610 (Bankr.D.Mass.1987).

Some courts have hinged the enforcement of an arbitration agreement on the core or noncore nature of the proceeding. In *Insurance Company of North America v. NGC Settlement Trust & Asbestos Claims Management Corporation (In re National Gypsum),* 118 F.3d 1056 (5th Cir.1997), the Chapter 11 debtor sought a declaration that its insurer's efforts to recover preconfirmation debts violated the discharge injunction and the confirmed plan. The insurer moved to stay the declaratory action, and for enforcement of its contractual arbitration clause. The bankruptcy court refused the stay, concluding it had discretion whether to enforce arbitration agreements in the context of a "core" proceeding in a Chapter 11 case. The Fifth Circuit rejected this single factor as determinative of the enforceability of arbitration provisions in bankruptcy:

> The core/non-core distinction conflates the inquiry set forth in *McMahon* and *Rodriguez [de Quijas v. Shearson/American Express, Inc.,* 490 U.S. 477, 109 S.Ct. 1917, 104 L.Ed.2d 526 (1989)] with the mere identification of the jurisdictional basis of a particular bankruptcy proceeding. Certainly not all core bankruptcy proceedings are premised on provisions of the Code that "inherently conflict" with the Federal Arbitration Act; nor would arbitration of such proceedings necessarily jeopardize the objectives of the Bankruptcy Code. Although, as appellees suggest, "the core/non-core distinction is a practical and workable one," it is nonetheless too broad. The "discretion" that ACMC and the Trust urge should exist only where a particular bankruptcy proceeding meets the standard for nonenforcement of an arbitration clause set forth in *McMahon* and *Rodriguez.*

*Id.* at 1067–68 (footnotes omitted). See also *United States Lines, Inc. v. American Steamship Owners Mutual Protection & Indemnity Ass'n, Inc. (In re United States Lines, Inc.),* 197 F.3d 631, 640 (2d Cir. 1999) (internal quotations and citations omitted) ("Core proceedings implicate more pressing bankruptcy concerns, but even a determination that a proceeding is core will not automatically give the bankruptcy court discretion to stay arbitration. Certainly not all core bankruptcy proceedings are premised on provisions of the Code that inherently conflict with the Fed-

eral Arbitration Act; nor would arbitration of such proceedings necessarily jeopardize the objectives of the Bankruptcy Code.... In exercising its discretion over whether, in core proceedings, arbitration provisions ought to be denied effect, the bankruptcy court must still carefully determine whether any underlying purpose of the Bankruptcy Code would be adversely affected by enforcing an arbitration clause.").

For the Fifth Circuit, the determinative question became whether the claim at issue was derivative of the debtor or of a right created by the Bankruptcy Code:

Indeed, distinguishing between those actions derived from the debtor and those created by the Bankruptcy Code explains the consistent reluctance to permit arbitration of actions brought to adjudicate bankruptcy rights. There can be little dispute that where a core proceeding involves adjudication of federal bankruptcy rights wholly divorced from inherited contractual claims, the importance of the federal bankruptcy forum provided by the Code is at its zenith. Arguably, these actions are simply beyond the coverage of most, if not all, arbitration provisions. But, assuming an otherwise applicable arbitration provision, the adjudication of these actions outside the federal bankruptcy forum could in many instances present the type of conflict with the purpose and provisions of the Bankruptcy Code alluded to in *McMahon*. *See Hays*, 885 F.2d at 1155 ("Claims asserted by the trustee under section 544(b) are not derivative of the bankrupt. They are creditor claims that the Code authorizes the trustee to asset on their behalf."); *In re Barney's Inc.*, 206 B.R. 336 (Bankr. S.D.N.Y.1997) (finding Chapter 11 debtor's section 544(a) avoidance action, section 549 avoidance action, and section 542 turnover action were not subject to arbitration); *In re Dunes Hotel Associates*, 194 B.R. 967, 992 (Bankr.D.S.C. 1995) (finding Chapter 11 debtor's section 544(a) avoidance action, section 542 turnover action, and section 365 rejec-

tion action were not subject to arbitration); *In re Arentson*, 126 B.R. 236, 238 (Bankr.N.D.Miss.1991) (refusing to order arbitration of a wrongful termination action brought by a Chapter 7 debtor under section 525(b), which provides redress for discrimination against an individual because of a bankruptcy filing, because it was a cause of action "exclusively related to a bankruptcy statute ... that literally begs for resolution in a bankruptcy forum"); *cf. In re Pate*, 198 B.R. 841, 846 (Bankr.S.D.Ga. 1996) (finding Chapter 13 debtor's Federal Truth in Lending Act claim involving the financing of a mobile home, which was core under § 28 U.S.C. 157(b)(2)(C) (counterclaims by the debtor's estate), was arbitrable).

We think that, at least where the cause of action at issue is not derivative of the pre-petition legal or equitable rights possessed by a debtor but rather is derived entirely from the federal rights conferred by the Bankruptcy Code, a bankruptcy court retains significant discretion to assess whether arbitration would be consistent with the purpose of the Code, including the goal of centralized resolution of purely bankruptcy issues, the need to protect creditors and reorganizing debtors from piecemeal litigation, and the undisputed power of a bankruptcy court to enforce its own orders.

*National Gypsum*, 118 F.3d at 1068–69.

 None of the claims or defenses raised by Pelikan or Nu-kote was created by the Bankruptcy Code. The direct claims the parties assert against each other are "inherited contractual claims" derivative of the prebankruptcy agreements that include the three arbitration provisions. Pelikan's affirmative defenses of setoff and recoupment, also are not bankruptcy created rights. "[N]o federal right of setoff is created by the Bankruptcy Code, [and 11 U.S.C. § 553(a) ] provides that, with certain exceptions, whatever right of setoff

otherwise exists is preserved in bankruptcy." *Citizens Bank of Md. v. Strumpf,* 516 U.S. 16, 18, 116 S.Ct. 286, 289, 133 L.Ed.2d 258 (1995). "Recoupment, . . . comes into bankruptcy law through the common law, rather than by statute, *see University Medical Center v. Sullivan (In re University Medical Ctr.),* 973 F.2d 1065, 1079 (3d Cir.1992), and is not subject to the limitations of section 553 or the automatic stay." *Malinowski v. New York State Dept. of Labor,* 156 F.3d 131, 133 (2d Cir.1998).

This is now a confirmed Chapter 11 case. With respect to the excess tax claims and environmental claims, the arbitration procedures in the agreements provide special knowledge or expertise that would help resolve the underlying technical disputes. Impact on the bankruptcy estate is minimal based on the confirmed Chapter 11 plan.[7] Some international interests are implicated because the agreements conclude an international transaction involving facilities in North America and Europe, and Pelikan is a Swiss entity. Nu-kote has failed to carry its burden to demonstrate substantial bankruptcy interests to overcome enforcement of the arbitration procedures agreed to before the Chapter 11 petition.

7. Nu-kote's plan, confirmed on November 30, 2000, formed a trust into which were transferred various assets including any "claims for environmental contamination and indemnification against Pelikan Holding AG and a $2.5 million letter of credit. . . ." The trust assets are "subject to the lien of NAC [Nukote Acquisition Corporation], the Reorganized Debtors right to received 75% of the Net Recoveries and the setoff and/or recoupment rights, if any, of certain parties as provided in § 17.15 of the Plan." Plan § 17.15 preserves Pelikan's rights to assert setoff or recoupment to the extent available under the Bankruptcy Code, applicable law or contract. "Net Recoveries" is defined under § 2.55 of the Plan to mean "the cash and cash equivalents and any other value, or proceeds of settlement, litigation or other disposition of the Causes of Action following payment of the advances by NAC to the Trust and (i) fees and expenses of the Trust, including the fees and expenses of the Trustee and the professionals of the Trust engaged by the Trustee in connec-

An appropriate order will be entered granting summary judgment and directing the parties to proceed to arbitration(s) consistent with this Memorandum.

tion with the administration of the Trust, (ii) normal expenses of administration of the Trust (including the establishment of such reserves as a Trustee deems appropriate) and the payments permitted by the Plan and the Trust Agreement, (iii) the liens of NAC on non-tort Causes of Action, and (iv) all taxes, fees, levies, assessments, or other governmental charges incurred by the Trust." NAC advanced $100,000 to the trust for evaluation and pursuit of Causes of Action. Additionally, pursuant to § 8.3 of the Plan, "[r]ecoveries from Pelikan Holding or the $2.5 million environmental escrow, if any, shall be first applied to repay advances by the Debtors or Reorganized Debtors with respect to the environmental cleanup of the Trust Pledged Assets." The net effect of these provisions of the Plan is that Pelikan's disputes with Nu-kote have been isolated and arbitration of those disputes is not likely to affect the rights of other prepetition creditors in any measurable amount.