ISP.COM LLC and ISP.net LLC,
Appellants (Defendants
below),

v.

David J. THEISING, Receiver of IQuest
Internet, Inc., Appellee (Plaintiff
below).

No. 29S02–0308–CV–00366.

Supreme Court of Indiana.

March 4, 2004.

Rehearing Denied June 1, 2004.

Jeffrey R. Gaither, T. Joseph Wendt, Indianapolis, IN, Attorneys for Appellants.

John C. Hoard, R. Brock Jordan, David J. Theising, Indianapolis, IN, Attorneys for Appellee.

ON PETITION TO TRANSFER FROM THE INDIANA COURT OF APPEALS, NO. 29A02–0207–CV–0610.

BOEHM, Justice.

The plaintiff is David J. Theising, as the receiver of IQuest Internet, Inc. The defendants responded to his complaint with a motion to compel arbitration of the dispute. The motion was based on an arbitration clause in an agreement entered into between the defendants and IQuest before IQuest was in receivership. The trial court refused to compel arbitration and the Court of Appeals affirmed that order on interlocutory appeal. We hold that the arbitration clause is enforceable against the receiver as the successor in interest to IQuest.

**Factual and Procedural Background**

This case comes to us on interlocutory appeal from denial of a motion to compel arbitration. As a result, we have the pleadings, which include salient documents as exhibits, but no hearings or development of the factual background. Our account of the facts is taken from the allegations of pleadings, some court orders, and the documentation of the transactions that gave rise to this dispute. There are significant gaps in the information available to us, and we have no confidence that the facts will prove to be as we currently understand them, or assume them to be. For purposes of this appeal, however, the only material facts are the allegations of the complaint and the relevant documents. We provide these allegations because the nature of the claims is relevant to the only issue before us, which is whether or not Theising is required to arbitrate his dis-

pute with ISP. Liability of other parties and arbitrability of disputes among other parties are not at issue here. Except where indicated, the following account is taken from the allegations of the complaint. They remain to be proven.

Until January 2000, IQuest Internet, Inc., an Indiana corporation, operated a "dial-up internet service" based in Hamilton County. Its president and majority shareholder was one Robert Hoquim, about whom more later. Four other individuals, John Carr, David Julius, Terry Meadors and Thomas Neville, Jr., were also shareholders and participated in the management of the company. On January 13, 2000, two Indiana limited liability companies, ISP.com, LLC and ISP.net, LLC (collectively "ISP"[1]), agreed to acquire the business. The form of the transaction was an asset sale embodied in an "Asset Purchase Agreement" whereby ISP agreed to purchase substantially all of the business assets of IQuest except cash and receivables and to assume designated liabilities. The agreement contained the lengthy list of warranties and representations usually found in an asset acquisition of a going business. Among these was IQuest's warranty, joined by Hoquim, that IQuest was current with taxing authorities. IQuest and Hoquim indemnified ISP against a variety of circumstances, including breach of any representation or warranty in the

agreement. The purchase price was stated as $23 million cash, and the agreement called for ISP to pay the price by wire transfer to an account designated by IQuest.

On February 16, 2000, the parties closed the sale, apparently without further documentation. Rather than paying the entire purchase price to IQuest, ISP paid $13.15 million of the purchase price directly to Hoquim in the form of $12 million in two promissory notes and $1.15 million in cash.[2] One note, for $2 million, matured in May of 2002, and apparently substantial payments were made on that note. The second note was for $10 million and would mature in 2005. ISP and Hoquim executed a "Loan and Security Agreement" securing ISP's obligations to Hoquim under the $10 million note and providing that ISP could set off against its obligations under the note any amounts Hoquim owed under the indemnity provisions of the Asset Purchase Agreement. In effect, the Loan and Security Agreement purported to permit ISP to invoke self-help to reduce the purchase price for IQuest's assets by the amount of any damages, at least up to $10 million, resulting from breaches of the seller's representations, undertakings or warranties. Another $3 million of the purchase price was paid in the form of issu-

---

1. ISP.com, LLC and ISP.net, LLC were the purchasers under the Asset Purchase Agreement. Another entity, IQuest Internet, LLC is also a defendant in the Marion County litigation referred to below, but there are no allegations as to it, and we are uncertain whether it became a successor in interest to the purchasers or had or has some other relation to this situation. Except where indicated, "ISP" refers to all ISP entities at the relevant time. The parties sometimes refer to the purchasers as "New IQuest" and the seller as "Old IQuest." That was too many IQuests for us, so we designate the purchasers "ISP" and the seller "IQuest."

2. This is the allegation of the complaint. The Court of Appeals concluded that $2 million was paid in cash to Hoquim. The complaint alleges that $5.85 million was paid to IQuest at the closing, which would produce total payments of $22 million ($5.85 to IQuest; $13.15 to Hoquim, and $3 to the two others). Perhaps the different descriptions stem from the amounts paid under the notes before ISP stopped making them. From this record we cannot resolve or reconcile this discrepancy, but, like several others noted, it is immaterial to the issues on this appeal.

ance of "ownership credits" in ISP[3] to Carr and Neville, both IQuest officers, in the amounts of $2 million and $1 million, respectively.

Hoquim died intestate in May 2000. The Court of Appeals tantalizingly informs us that at the time of his death Hoquim was "a thirteen year fugitive wanted by the Federal Bureau of Investigation whose real name was John Paul Aleshe,"[4] but supplies no elaboration on this unusual circumstance. There are other interesting gaps in the information available to us. The record does not reveal the ownership of ISP before or after the sale, so we are in the dark as to the relative equity position in ISP the "ownership credits" represented. Nor are we told whether ISP had an independent existence before the sale or was newly formed for purposes of acquiring IQuest's assets. We are given no indication of the circumstances of Hoquim's death, and, consistent with the many lacunae in this record, we are not told whether his name was pronounced "hokum", "ho-KEEM" or something else. Whatever the answer to these mysteries, it seems clear that IQuest was not without its problems. The receiver alleges that neither IQuest since its inception in 1995 nor Hoquim for many years before that had paid any federal or state taxes, and at the time of the sale IQuest had a substantial liability to taxing authorities. If true, these allegations would appear to establish a breach of the warranty in the Asset Purchase Agreement.

As best we can make out, this appeal is taken in the fourth of four separate but related legal proceedings. First, on December 15, 2000, IQuest was thrown into receivership by its creditors and the Hamilton Superior Court, in cause CP–668, appointed Theising as receiver. Second, Hoquim's Estate was opened at some point, apparently as a probate matter[5] in Hamilton County as cause ES–44. Third, on January 16, 2001, Hoquim's Estate filed cause CP–75 in Marion Superior Court Room 11 to collect the note from ISP.com and ISP.net and two individuals who guaranteed ISP's note to Hoquim.

On March 30, 2001, ISP moved to arbitrate the Marion County case. While that motion was pending, on September 4, 2001, the Hamilton Superior Court entered an order in Hoquim's Estate finding that Theising was entitled to the $10 million note and some $1.8 million in cash representing the proceeds of ISP's payments on the two notes before ISP stopped paying. The basic reasoning of the court in the estate proceeding was that the direct payments of the asset purchase price to Hoquim had been frauds on creditors of IQuest. On September 21, 2001, the Marion Superior Court ordered arbitration of

---

3. It is unclear from this record in what ISP entity or entities these "credits" were given, and what their precise form was. All seem to agree that whatever these were, they represented equity interests in the business operated by IQuest before the sale and by ISP thereafter. For purposes of this opinion, that is enough.

4. For this proposition the Court of Appeals cited *"WISH–TV, Secret Identity* (June 8, 2000), *available at* http://www.wishtv.com/Global/story.asp?s=84881 (last visited Jan. 28, 2003)."

5. This is an assumption we make based on the case number "ES–44", and the title of the proceeding "In the matter of the Estate of Robert P. Hoquim, formerly known as [21 other names]." We have no record from that proceeding, but an "Order Regarding Twelfth Petition For Instructions" ruling on the Estate's surrender of the note and proceeds to Theising is before us as an exhibit in the record from the appeal in the Marion County suit.

the dispute before it.[6] In December 2001, pursuant to the order of the Hamilton County probate court, Hoquim's Estate assigned the $10 million note from ISP to Theising, as receiver of IQuest, and Theising was substituted for IQuest as plaintiff in the Marion County case. Theising unsuccessfully filed a Motion to Correct Errors seeking to overturn the order to arbitrate and has separately appealed the Marion County order directing arbitration of the claim to collect the note.[7]

This appeal is taken from rulings of the trial court in a suit filed in Hamilton Superior Court as PL–104. The defendants in this case are ISP.com, ISP.net, and Carr, Neville, Julius and Meadors, who Theising alleges were shareholders, officers and directors of IQuest at all relevant times. On February 15, 2002, after obtaining the approval of the receivership court, Theising filed the current complaint in Hamilton Superior Court. In this lawsuit, which is separate from both the receivership and the Estate, Theising alleges that the shift in method of closing the asset sale to payment of the purchase price directly to Hoquim and others amounted to a fraudulent transfer by IQuest in which ISP and the four other individual defendants participated in various capacities and for which each of them was liable. Theising claims, among other things, that the closing left IQuest with insufficient funds to pay its debts. The complaint alleges that IQuest was insolvent at the time of the sale and also after the sale when the four individuals surrendered their IQuest shares in exchange for substantially all of the cash IQuest received from ISP. The complaint alleges that these exchanges, and the "ownership credits" to Carr and Neville, were fraudulent conveyances that Theising, as IQuest's receiver, is entitled to set aside. The same basic facts are alleged to support claims against these four individuals for negligent mismanagement of IQuest, director liability for unlawful distributions from an insolvent corporation, and breach of fiduciary duty to creditors of IQuest.

In addition to the fraudulent conveyance claims, Theising's complaint also alleges that the four individuals acted on behalf of ISP in the acquisition and knew of IQuest's false representations in the Asset Purchase Agreement. Theising contends that ISP is charged with this knowledge and is therefore estopped from asserting breaches of those representations and warranties as a setoff against ISP's obligations on the note.

On June 10, 2002, ISP moved in this proceeding in Hamilton County to stay proceedings and compel arbitration of this dispute based on the arbitration clause in the Asset Purchase Agreement. The trial court denied ISP's motion and the Court of Appeals affirmed. We now grant transfer and reverse the trial court.

---

6. A different panel of the Court of Appeals, following the Court of Appeals ruling in this appeal, found the case not arbitrable and reversed the Marion Superior Court judgment ordering arbitration. Transfer has been sought in that case as well, and its record is now before us. Some of the facts included in this opinion are drawn from the record in the Marion County case. This is appropriate on appeal. *Ind. Revenue Bd. v. Hansbrough*, 275 Ind. 426, 433, 417 N.E.2d 311, 315–16 (1981).

See also *De Bearn v. Safe Deposit & Trust Co.*, 233 U.S. 24, 32, 34 S.Ct. 584, 58 L.Ed. 833 (1914); *Westfall v. Wait*, 165 Ind. 353, 358, 73 N.E. 1089, 1091 (1905); *Phelps v. Porter County Office of Family & Children*, 734 N.E.2d 1107, 1115 (Ind.Ct.App.2000); *Studabaker v. Faylor*, 52 Ind.App. 171, 173, 98 N.E. 318, 319 (1912).

7. Today we affirm the order of the Marion Superior Court in *Theising v. ISP.com, LLC*, 805 N.E.2d 778, 2004 WL 396452 (Ind.2004).

## I. Receiver's Obligation to Arbitrate

As already noted, in the estate proceeding, the court concluded that Hoquim could not retain the note or the cash payments made under them because their direct payment to Hoquim constituted a fraud on creditors of IQuest. Fraud on creditors is essentially the same theory Theising now pursues in attempting to recover from the individual defendants. Insofar as the complaint seeks relief from ISP, however, Theising seeks more than simple restitution of assets diverted from IQuest. Hoquim's Estate apparently did not seek to invoke arbitration, and the issues on this appeal were not raised in the estate proceeding. Similarly, there appears to be no claim raised here that the ruling of the Marion Superior Court ordering arbitration of the note claim is res judicata or otherwise precludes Theising from relitigating arbitrability in this case. Accordingly, we address the contention that disputes between ISP and Theising must be arbitrated as a freestanding issue.

### A. *Arbitrability of Fraud Claims*

The Court of Appeals acknowledged the "general rule" that a receiver for a corporation " 'takes only the rights of the corporation, such as could be asserted in its own name.' " *ISP.com, LLC v. Theising,* 783 N.E.2d 1228, 1231 (Ind.Ct.App.2003) (quoting *Voorhees v. Indianapolis Car & Mfg. Co.,* 140 Ind. 220, 239, 39 N.E. 738, 744 (1895)). However, the Court of Appeals, again quoting *Voorhees,* noted an exception to this rule for "acts ... done in fraud on the rights of [creditors or shareholders], but which are valid against the corporation itself." *Id.* From this, the Court of Appeals concluded that Theising may act to represent creditors who "are charging that fraud has occurred," and because the IQuest's creditors were not parties to the arbitration clause, Theising was free to

bring his claims in court to the extent they charge fraud. *Id.* The fraudulent conveyance claims were claims of fraud, therefore no arbitration was required.

■ We agree with these general propositions, but believe the Court of Appeals has read them too broadly. *Voorhees* was a case where this Court reversed a trial court ruling permitting a group of creditors to assert claims on behalf of a corporation already in receivership. This Court pointed out the chaos that could result from permitting each individual creditor to exercise its own judgment as to potential claims by the corporation. The passage quoted above appears in the course of discussing that issue. For the proposition that the receiver stands in the shoes of the corporation, the Court cited James L. High, *Receivers,* § 315, at 249 (2d ed. 1886), and Charles Fisk Beach, *Commentaries on the Law of Receivers* § 639 (1894). We agree that the receiver succeeds to the rights of the corporation, and that the receiver is obligated to act in the interest of the creditors. But that does not mean a receiver may pursue any fraud action unfettered by the obligations of the corporation, and we do not read the cited authorities to suggest that. Rather, the receiver is not barred by defenses that may preclude recovery by the corporation if the acts complained of constituted a fraud on shareholders or creditors. *See McCandless v. Furlaud,* 296 U.S. 140, 159, 56 S.Ct. 41, 80 L.Ed. 121 (1935) (citing *Casey v. Cavaroc,* 96 U.S. 467, 488, 24 L.Ed. 779 (1877); *Am. Can Co. v. Erie Preserving Co.,* 171 F. 540, 542 (W.D.N.Y. 1909); *Waslow v. Grant Thornton, LLP,* 240 B.R. 486, 505 (Bankr.E.D.Pa.1999); *Marcovich v. O'Brien,* 63 Ind.App. 101, 113, 114 N.E. 100, 104 (1916). But the fraud exception applies only to those claims where the receiver's interest is adverse to the corporation and where the

fraud is such that, as *Voorhees* put it, the receiver attacks acts that are "valid against the corporation itself." This exception permits a receiver to assert claims free from defenses, such as *in pari delicto*, that might bar the corporation. For example where the corporation was a tool of its management in a scheme to defraud investors, the corporation's receiver was not precluded from recovering assets fraudulently stripped from the corporation. *See Scholes v. Lehmann,* 56 F.3d 750, 754 (7th Cir.1995). The receiver is in some respects a new entity, untainted by the corporation's wrongdoing. He is not necessarily barred by *in pari delicto.* Elimination of an *in pari delicto* defense permits the receiver to prevail in asserting the corporation's rights but it does not result in the receiver's asserting rights of creditors. *Id.* This doctrine eliminates defenses to claims by the corporation. But we see no reason why it should relieve the receiver generally of the contractual undertakings such as an arbitration or forum selection clause, unless the clause itself is fraudulently induced.

### B. *The Nature of the Receiver's Claims*

■ Here the thrust of much of the complaint is recovery of assets diverted from IQuest to its shareholders, and the liability of those same individuals for corporate mismanagement in their roles as officers and directors. These seem to be classic examples of claims the corporation itself could pursue, and therefore, although claims of fraud, do not fall within the exception permitting the receiver to assert claims free from defenses that might bar the corporation because he is essentially adverse to the corporation. But the issue here is not arbitration of issues of liability of the director-shareholders who received these assets or who ran IQuest for several years. ISP alone seeks arbitration. The first allegation against ISP appears in

Count XI of Theising's complaint, following ten counts against the individuals. Theising there asserts estoppel against ISP's assertion of breach of IQuest's warranty regarding current taxes. This estoppel is alleged to arise from Theising's allegation that the four individuals acted for both IQuest and ISP in the asset sale, and therefore their knowledge of IQuest's failure to file tax returns is chargeable to ISP, and precludes ISP's reliance on the warranty to reduce the purchase price. This theory of ISP's complicity in the wrongs alleged against IQuest's management presents an entirely different complex of issues from the liability of those individuals. It amounts to a claim that ISP is chargeable with the actions of the director-shareholders of IQuest. If that is the case, ISP's liability is one for which IQuest would have a remedy. If IQuest were not in receivership, there would be no reason why it could not pursue such a claim against ISP and its former directors. If the four individuals were still in charge of IQuest, a shareholder derivative suit could assert such a claim. In either case, however, the corporation's agreement to arbitrate that dispute would be enforceable. The receiver is bound by the undertakings of the corporation unless the undertaking itself constitutes a fraud on creditors.

The facts alleged in these complaints, none of which have gone to trial, suggest a wide range of possible scenarios. At one extreme, ISP is composed of new investors who were victims of a scheme to sell off an insolvent corporation at an exorbitant price. In that view, the creditors were not harmed by the sale as long as the real purchase price, net of offsets, is recovered from the selling shareholders for their benefit, leaving the assets for creditors as they were before the sale. Or ISP could be nothing more than a tool of IQuest's

management in an attempt to bail out of a sinking operation at the expense of both IQuest's creditors and ISP's financiers. Or ISP could be merely an alter ego of IQuest's former management in a scheme to reincorporate free of the liabilities IQuest had accumulated. Or the sale could be in substance a reorganization designed to cash out Hoquim but leave the rest of ownership and management in place. We cannot evaluate whether, as Theising alleges, the management of IQuest was on both sides of the table at the closing, or a number of other questions that this incomplete record presents. We identify these possibilities not because we suggest any of them reflect the facts of this case, but to underscore the point that at this stage it is not easy to separate the good guys from the bad guys, assuming there are some bad guys. This further bolsters the conclusion that the receiver steps into the shoes of the corporation, and should have no worse and no better hand to play than his predecessor in dealing with this cast of potential victims and perpetrators.

### C. *Assertion of Claims of Creditors*

■ An arbitration clause, like any other contract, binds the parties to the agreement and those in privity. *Mislenkov v. Accurate Metal Detinning, Inc.*, 743 N.E.2d 286, 289 (Ind.Ct.App.2001); *see OEC–Diasonics v. Major*, 674 N.E.2d 1312, 1314–15 (Ind.1996). Privity is found if a non-party holds "a mutual or successive relationship with [a party] with regard to property or that their interests are so identical as to represent the same legal right." *Mislenkov*, 743 N.E.2d at 289. A receiver of a corporation is in privity with that corporation. *Marion Trust Co. v. Blish*, 170 Ind. 686, 693, 84 N.E. 814, 817 (1908); *Federal Sav. & Loan Ins. Corp. v. Dir. of Revenue*, 650 F.Supp. 1217, 1223 (N.D.Ill.1986); *Buchanan v. Hicks*, 98

Ark. 370, 136 S.W. 177, 180 (1911); *Armstrong v. Greenwich Motors Corp.*, 116 Conn. 487, 165 A. 598, 599 (1933); *Brooks v. Miami Bank & Trust Co.*, 116 Fla. 589, 156 So. 757, 759 (1934). We agree with the Court of Appeals that creditors of a corporation are not in privity with it. We disagree that a receiver generally represents the creditors, in the sense that the receiver can assert the creditors' claims for them.

■ The Court of Appeals cited *Capitol Life Ins. Co. v. Gallagher*, 839 F.Supp. 767, 768 (D.Colo.1993), for the view that a receiver may assert claims of creditors. We think that case supports the opposite conclusion as applied to a state law receiver for a general business corporation like IQuest. Gallagher was the Florida Insurance Commissioner who became the receiver of GSL, an insolvent insurer. He sought the right to assert a class action on behalf of GSL's policyholders against Capitol Life, which had a reinsurance agreement with GSL. The federal court permitted Gallagher to present a class action claim on behalf of policyholders directly, asserting their rights under the insurance contracts. *Id.* at 770. The decision was driven by the unique legal framework that governs insurance companies, which are not subject to bankruptcy laws, and are liquidated or rehabilitated under state law. 11 U.S.C. § 109(b)(2) (2000); *Sims v. Fidelity Assurance Ass'n*, 129 F.2d 442, 451 (4th Cir.1942). It does not apply to claims asserted as a receiver. As the federal district court pointed out, it was "undisputed that Gallagher, as ... receiver, may be compelled to arbitrate ... because Gallagher 'stands in the shoes' of GSL." *Capitol Life*, 839 F.Supp. at 769 (quoting *Phillips v. Lincoln Nat'l Health & Cas. Ins. Co.*, 774 F.Supp. 1297, 1299 (D.Colo.1991)). This conclusion is fortified by the principal authority cited in *Capitol Life. Hays & Co.*

*v. Merrill Lynch, Pierce Fenner & Smith, Inc.,* 885 F.2d 1149, 1155 (3d Cir.1989), permitted a bankruptcy trustee to assert claims on behalf of creditors of the bankrupt. Like the insurance commissioner in *Capitol Life,* a bankruptcy trustee may assert claims on behalf of creditors by reason of a unique statute. *Id.* Section 544(b) of the Bankruptcy Code explicitly authorizes a bankruptcy trustee to void any transfer by the debtor that "is voidable under applicable law by a creditor...." 11 U.S.C. § 544(b). By reason of this provision, the Third Circuit held the trustee could properly assert claims of creditors, but only those claims that fell within § 544(b). Except for the claims specifically authorized by 11 U.S.C. § 544(b), however, the Third Circuit, following a long line of federal cases,[8] concluded that the claims the trustee sought to assert were governed by the arbitration clauses in the debtor's agreements. *Hays & Co.,* 885 F.2d at 1154 . In short, in the absence of a statutory authorization, a receiver of a corporation under Indiana law has no more status to assert claims of others than the corporation had. IQuest had no right to assert claims of creditors or other parties. The rights the receiver has are only those the corporation had. The receiver, like the corporation, is subject to the arbitration undertaking in its agreement, subject only to whatever exceptions and limitations would be available to IQuest itself. The receiver is of course obligated to protect the interests of creditors. *Deitrick v. Standard Sur. & Cas. Co.,* 303 U.S. 471, 483, 58 S.Ct. 696, 82 L.Ed. 962 (1938); *Campbell Leasing, Inc. v. FDIC.,* 901 F.2d 1244, 1249 (5th Cir.

1990); *Marcovich v. O'Brien,* 63 Ind.App. at 113, 114 N.E. at 104 (1916). But that does not mean the receiver can take over the claims of creditors and assert them on his own. Rather the receiver succeeds to the rights of the corporation as he finds it, and that includes any arbitration obligations the corporation has incurred. If the receiver has a claim that the arbitration clause is itself the product of fraud, then that claim can be presented in a proper forum. Here, however, the receiver seeks to embrace the asset sale and claim the proceeds, but disavow the arbitration clause. That seems a difficult hill to climb, and Theising asserts no claim that the entire Asset Purchase Agreement should be rescinded.54

## II. Application of the Arbitration Clause to These Claims

■ Whether a particular claim must be arbitrated is a matter of contract interpretation. *See First Options of Chicago, Inc. v. Kaplan,* 514 U.S. 938, 944, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995); *AT & T Techs., Inc. v. Communications Workers of Am.,* 475 U.S. 643, 648, 106 S.Ct. 1415, 89 L.Ed.2d 648 (1986); *PSI Energy v. AMAX, Inc.,* 644 N.E.2d 96, 99 (Ind.1994); *Int'l Creative Mgmt. v. D & R Entm't Co.,* 670 N.E.2d 1305, 1311 (Ind.Ct.App.1996). Theising contends that even if his rights are identical to IQuest's, IQuest did not agree to arbitrate the claims he asserts. The arbitration clause in question is found in Section 9.16 of the Asset Purchase Agreement. It calls for arbitration of "any dispute arising out of or relating to this Agreement, or the breach thereof." The claims asserted by Theising against ISP

---

**8.** *Fallick v. Kehr,* 369 F.2d 899, 904 (2d Cir. 1966); *In re Morgan,* 28 B.R. 3, 5 (B.A.P. 9th Cir.1983); *In re Guy C. Long, Inc.,* 90 B.R. 99, 102 (E.D.Pa.1988); *Societe Nationale Algerienne Pour La Recherche v. Distrigas Corp.,* 80 B.R. 606, 609 (D.Mass.1987); *In re R.M. Cor-*

*dova Int'l, Inc.,* 77 B.R. 441, 450 (Bankr. D.N.J.1987); *Barber–Greene Co. v. Zeco Co.,* 17 B.R. 248, 250 (Bankr.D.Minn.1982); *In re Cres Rivera Concrete Co.,* 21 B.R. 155, 157 (Bankr.D.N.M.1982).

are described above. The claims are stated in terms of ISP's liability for the diversion of assets from IQuest, ISP's inability to set off the purchase price for warranty breaches, and ISP's liability for IQuest's liability for past taxes by reason of the transfer of IQuest's assets for less than adequate consideration rendering IQuest insolvent. All "relate to" the sale agreement or ·its breach and are within the terms of the arbitration agreement. Theising also seeks a declaration that taxing authorities can pursue ISP for IQuest's delinquencies. That contention may raise a number of other issues as to which the tax authorities, not Theising, may be the proper plaintiff, but to the extent the issue is a dispute between ISP and Theising, it arises out of the asset sale and is required by the terms of the agreement to be arbitrated.

 Theising's principal claim is that ISP continues to owe the full amount of the contracted purchase price to IQuest, without setoff for any claimed breaches of representations or warranties. He contends that that issue is not required to be arbitrated because it arises under the note and Loan Security Agreement, not the Asset Purchase Agreement. The Court of Appeals agreed with Theising. We do not. For the reasons already given, the arbitration clause in the Asset Purchase Agreement applies to the claims Theising asserts. There is no requirement that an arbitration clause be included in all potentially relevant documents to be binding if it covers the dispute at hand. *see ·R.J. O'Brien & Assoc. v. Pipkin,* 64 F.3d 257, 261 (7th Cir.1995) (contract did not need to contain an explicit arbitration clause if it validly incorporated by reference an arbitration clause in another document) (quoting *Helen Whiting, Inc. v. Trojan Textile Corp.,* 307 N.Y. 360, 121 N.E.2d 367, 371 (1954); *Imptex Int'l Corp. v. Lorprint,*

*Inc.,* 625 F.Supp. 1572, 1572 (S.D.N.Y. 1986) ("While an arbitration agreement must be in writing to be enforceable, there is no requirement that it be signed.")). As long as one agreement between two parties includes an agreement to arbitrate, that is enough to bind both parties to that undertaking. The issue is simply whether the Asset Purchase Agreement arbitration clause includes an agreement to arbitrate the issues Theising raises. If it does, then arbitration is required, whether or not other documents include arbitration provisions, unless the other documents supersede the arbitration commitment.

 We do not find any affirmative intention in the loan documents to undo the arbitration covenant found in the Asset Purchase Agreement. Theising points out that the Loan and Security Agreement includes a forum selection clause and a consent to jurisdiction in Marion County. He argues that these demonstrate an intention not to arbitrate any dispute under the note or Loan and Security Agreement. Again, we disagree. It is not uncommon to find both arbitration and forum selection clauses in agreements. *See, e.g., Cortez Byrd Chips, Inc. v. Bill Harbert Constr. Co.,* 529 U.S. 193, 201, 120 S.Ct. 1331, 146 L.Ed.2d 171 (2000); *Jumara v. State Farm Ins. Co.,* 55 F.3d 873, 875 (3d Cir.1995); *Pacemaker Plastics Co. v. AFM Corp.,* 163 F.Supp.2d 795, 807 (N.D.Ohio 2001). Several considerations may lead to the inclusion of both. First, and obviously, arbitration may be waived by the parties. *Germany v. River Terminal Ry. Co.,* 477 F.2d 546, 547 (6th Cir.1973); *Uwaydah v. Van Wert County Hosp.,* 246 F.Supp.2d 808, 810 (N.D.Ohio 2002); *Miller Constr. Co. v. First Baptist Church, Inc.,* 396 So.2d 281, 282 (Fla.Dist.Ct.App.1981); *Shahan v. Brinegar,* 181 Ind.App. 39, 44, 390 N.E.2d 1036, 1040 (1979). If they choose, they may prefer to litigate, but be

required to do so in a designated forum. Second, any claim of fraud in the inducement, etc., may be presented to a court despite an arbitration clause. *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 404, 87 S.Ct. 1801, 18 L.Ed.2d 1270 (1967); *Phillips v. Assocs. Home Equity Servs.*, 179 F.Supp.2d 840, 845 (N.D.Ill.2001); *Allied Sanitation, Inc. v. Waste Mgmt. Holdings, Inc.*, 97 F.Supp.2d 320, 333 (E.D.N.Y.2000). The forum selection provision may apply in that circumstance, and is not surplusage for that reason also.

▮ The Court of Appeals pointed out that the Loan and Security Agreement includes an integration clause, providing that the Loan Agreement and Note "constitute the complete agreement of the parties hereto and supersede all previous understandings relating to the subject matter hereof." There is no arbitration clause in either the note or the Loan and Security Agreement. However, both the note and the agreement provide for ISP to set off any "Indemnity Obligation" under the Asset Purchase Agreement against ISP's obligations under the note. The Loan and Security Agreement defines "Indemnity Obligation" as any "claim for indemnification that has been finally determined in accordance with Article VIII of the Asset Purchase Agreement." Article VIII in turn includes a dispute resolution mechanism that culminates in arbitration under section 9.16 quoted above. It seems clear that this contemplates arbitration of any dispute over ISP's right to a setoff based on breaches of the Asset Purchase Agreement. Setoff is permitted only if a claim for indemnity (which would include a claim for breach of warranty) is "finally determined" under the procedure contemplated by Article VIII, which ultimately requires arbitration under section 9.16.

We think this elaborate structure evidences an agreement to arbitrate disputes arising from the sale. Agreements for business acquisitions are intended to flush out problems in the acquired business by requiring the sellers to warrant that circumstances are as they seem, and accept the consequences of a price reduction if that does not prove to be the case. Refusal to give a requested warranty or representation is a red flag that there may be a risk the seller is unwilling to accept, and both parties understand that. Buyers also recognize that unless there is a mechanism to gain, in effect, a refund of the purchase price, there may be significant practical obstacles to collecting from the former shareholders of the business being sold. For that reason, techniques to permit self-help or automatically triggered relief, such as escrows or as in this case, setoffs against seller financing, are frequently found in sales of going businesses. If the note and Loan and Security Agreement did not contemplate arbitration, a claim could never be "finally determined" under Article VIII, and the entire rather elaborate mechanism for retroactive price adjustment based on breaches of warranty would collapse. We do not believe the parties intended that result, or if the sellers did, it was too cute by half. In either case, the agreement to arbitrate was made and should be enforced.

### Conclusion

The order of the trial court denying the motion to compel arbitration is reversed. This case is remanded with instructions to order the plaintiff, ISP.com, LLC and ISP.net, LLC to arbitrate their dispute under section 9.16 of the Asset Purchase Agreement.

SHEPARD, C.J., and DICKSON, SULLIVAN, and RUCKER, JJ., concur.